UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
STANDARD CHARTERED BANK,          :     **AMENDED OPINION AFTER**
                                          :     **TRIAL, WITH**
                        Plaintiff,     :     **FINDINGS OF FACT AND**
     -against-                      :     **CONCLUSIONS OF LAW**
                                            :
AWB (USA) LTD.,                    :     05 Civ. 2013 (AKH)
                                            :
                        Defendant.    :
                                            :
------------------------------------------------------------- x
ALVIN K. HELLERSTEIN, U.S.D.J.:

        The health and welfare of the United States economy depends on a strong

domestic agriculture and substantial exports of its farm products.  The United States Department

of Agriculture furthers this policy by providing partial financial guarantees to exporters, thus

sharing the risk of non-payment with them.  This case, involving exports of soybeans to

Indonesia, arises from stratagems of private parties to take advantage of both the government

guarantees and the payments made by importers, without sharing those payments with the

government as the law and the governing contracts require.

        AWB (USA) Ltd., an American subsidiary of an Australian parent company,

accepted the benefit of Department of Agriculture guarantees to export shipments of soybeans to

Indonesia.  It financed the exports, as Department of Agriculture regulations permitted, by

discounting the importers' promissory notes with Standard Chartered Bank, an English bank

licensed to do business in New York City.  The methods by which AWB (USA) Ltd. first

arranged to secure the bank against loss, and then impaired those arrangements in relation to

Department of Agriculture regulations, are the tale of this lawsuit.

        Plaintiff Standard Chartered Bank filed this lawsuit in February 2005, seeking to

recover its loss of $22,660,790.40, plus interest, from defendant AWB (USA) Ltd.  After

extensive pre-trial proceedings, the case came on for trial before me, without a jury, on November 13, 14, 15 and 19, 2007.  At the conclusion of trial, on November 19, 2007, I delivered my decision extemporaneously, reciting extensive findings of fact and conclusions of law, and finding in favor of the plaintiff, Standard Chartered.

Following the close of trial, the parties submitted post-trial motions: Standard Chartered made a motion to amend the findings and conclusions, and AWB (USA) made a motion for a new trial and for reversal of the Court's findings and conclusions.  This written decision, responding to the parties' post-trial motions and argument, and reflecting further thinking on my part, supplants the rulings made on the record on November 19, 2007.  Except as reflected in this written decision, I deny both parties motions.

## Summary of Decision

I hold, for the reasons stated in this decision, that defendant AWB (USA) Ltd. breached its contract with plaintiff Standard Chartered Bank, and that plaintiff is entitled to recover $23,859,775.70, inclusive of interest to November 20, 2007, plus interest thereafter and costs.  I hold, further, and for the reasons discussed below, that Standard Chartered Bank is not entitled to indemnification from AWB (USA) Ltd. of its attorneys' fees and other expenses.

## The Parties

Standard Chartered Bank is an English bank, with its executive offices in London and several offices worldwide, doing business in New York State through its branch located and licensed here.  AWB (USA) Ltd. is a corporation incorporated in Delaware, with a principal place of business in Portland, Oregon.  Its parent, AWB Ltd. is an Australian company, based in Melbourne, Australia.  AWB Ltd. established its American subsidiary to engage in the business of exporting American agricultural products and, as an American company, to be eligible for

guarantee-subsidies by the United States Department of Agriculture. See 7 C.F.R. §

1493.420(a)(4); 1493.410(a). AWB Ltd., the Australian parent, also set up a Switzerland

subsidiary, AWB (Geneva) SA, to arrange financing for the exports made by its sister American

company and, as will be seen, to shift the profits from the American to the Swiss subsidiary,

thereby avoiding United States income taxes.

The Department of Agriculture guarantees were administered by a government-

owned corporation, the Commodity Credit Corporation ("CCC"). The guarantees were regulated

by an extensive set of regulations, known as the Supplier Credit Guarantee Program (SCGP), set

out at 7 C.F.R. §§ 1493.400 et seq. The purpose of the SCGP is to develop and expand United

States agricultural exports and to encourage United States exporters to extend financing on credit

terms to importers. Id. § 1493.400(a)(1). The SCGP is designed to assist "in cases where credit

is necessary to increase or maintain U.S. exports to a foreign market and where private U.S.

exporters would be unwilling to provide financing without CCC's guarantee." Id. §

1493.400(a)(2). "The program is targeted toward those countries where the guarantees are

necessary to secure financing of the exports but which have sufficient financial strength so that

foreign exchange will be available for scheduled payments." Id. By encouraging exports to

multiple importers, including those with less creditworthy capacity, the U.S. policy of increasing

agricultural exports is furthered.

### The U.S. Supplier Credit Guarantee Program

For exporting arrangements that qualify for the SCGP, the CCC offers a 65

percent guarantee against the default of a foreign importer, thereby taking on a significant

portion of the risk of default.  Id. § 1493.400(a)(3).  In exchange, the exporter, or the assignee of

the exporter, must share any recoveries with the CCC, recovered "from the importer or any other

source whatsoever," 65 percent to the CCC, and 35 percent to the exporter or the exporter's

assignee:

> In the event that monies for a defaulted payment are recovered by
> the exporter or the exporter's assignee from the importer or from
> any other source whatsoever, such monies shall immediately be
> paid to the Treasurer, CCC.

Id. § 1493.520(b)(1)

And, further, in the event that CCC makes recovery, from either the importer or

the exporter "or any other source whatsoever," CCC is to make the same allocation, keeping 65

percent for itself, and remitting 35 percent to the exporter, or the exporter's assignee:

> Recoveries made by CCC from the importer, and recoveries
> received by the CCC from the exporter, the exporter's assignee, or
> any other source whatsoever, will be allocated by CCC to the
> exporter or the exporter's assignee and to CCC on a pro rata basis .
> . . .

Id., § 1493.520(c).

### The Structure of the Transactions at Issue

The Indonesian importers of soybeans gave 180-day promissory notes to AWB

(USA).  Simultaneously, AWB (USA) entered into several separate, but inter-dependent,

arrangements:

1. AWB (USA) paid the American growers of the soybeans (or middle-men) the

   price of soybeans, f.o.b. the ship at the United States port of embarkation ("the

   f.o.b. price").

2.  AWB (USA) sold the cargo to its sister company in Geneva, AWB (Geneva),

   essentially at cost (the f.o.b. price paid to the American grower).

3. Without any movement of cargo, AWB (Geneva) immediately sold back the cargo to AWB (USA), but with a profit to AWB (Geneva) added, and inclusive of the costs of the ocean voyage, insurance and freight; the price was expressed as cost and freight from the port of disembarkation in Indonesia (the c.&f. price).

4. AWB (USA) obtained the CCC's 65 percent guarantee. Thus, the guarantee covered both the delivered costs of the exported soybeans borne by AWB (USA), and the profit of the exportation enjoyed by AWB (Geneva), to the extent of 65 percent of the face value of the 180-day promissory notes given by the importers.[2]

5. AWB (USA) assigned the importers' promissory notes via Note Purchase & Assignment Agreement (NPAA) at a discount to Standard Chartered, obtaining immediate full payment of the face value of the notes, less a finance fee equivalent to LIBOR plus a half-percent (the London Interbank Offered Rate plus 45 basis points). The assignment was made on a without recourse basis.

6. AWB (USA) also assigned and delivered to Standard Chartered the CCC guarantee and an undertaking to arrange for standby letters of credit covering the 35 percent balance of the face value of the importers' promissory notes. An affiliate of AWB (USA), AWB (Geneva), secured the standby letters of credit. The standby letters of credit were issued by a bank acceptable to

---

[2]   The consequence of the transactions was to remove profits, incurred within the United States and guaranteed by the United States, from the jurisdiction of the United States to a more benign taxing sovereignty outside the United States. The trial testimony suggested that other grain exporters employed similar strategies to avoid United States taxes, after taking full benefit of United States government guarantees.

Standard Chartered, ANZ Banking Group Ltd., a major Australian bank with a branch operating in London. Thus, Standard Chartered obtained full security for 100 percent of the 180-day promissory notes given by the importers to AWB (USA), and assigned without recourse by AWB (USA) to Standard Chartered.

AWB (USA) and Standard Chartered Bank executed twenty-eight such transactions. Six of the transactions are at issue in this lawsuit.

### The Note Purchase and Assignment Agreements

AWB (USA) assigned the 180-day promissory notes given by the importers to Standard Chartered via the NPAAs. AWB (USA), as Exporter, represented and warranted to Standard Chartered, the Assignee, among other representations and warranties, that it "has complied and will comply" with CCC requirements for "obtaining" and "maintaining in force" the 65 percent payment guarantee, that the guarantee "affords coverage in an amount equal to not less than 65 percent of the dollar value" of the exported commodities, that it "has complied and will continue to comply in a timely manner with all regulations and requirements of CCC so as to insure that the Payment Guarantee remains in full force and effect" and that, in the event that it recovers payments from the importers, it will "hold such amounts in trust and forthwith pay such amounts over to Assignee for distribution to CCC." In short, AWB (USA) represented and warranted to Standard Chartered that the CCC guarantee would remain in force at 65 percent of face value at maturity, and that such payments as it recovers from importers will be held by it in trust, via Standard Chartered, for the benefit of the CCC. The relevant provisions are as follows:

3.    <u>Representations and Warranties.</u>    The Exporter hereby represents and warrants that:

. . .

(c)     Exporter has complied and will comply in all respects with the requirements of the Commodity Credit Corporation in obtaining, maintaining in force and assigning the Payment Guarantee (including without limitation, any such requirements arising after issuance and assignment of the Payment Guarantee).

(d)     The Payment Guarantee affords coverage in an amount equal to not less than 65% of the dollar value of the documents presented with the Note which represent the unpaid port value of the commodity or commodities being exported; and the amount to be discounted by the Assignee will not exceed the unpaid port value of the related export commodity.

. . .

(g)     The Exporter has paid, and will pay all fees due in connection with the Payment Guarantee and any amendment thereto, and the Exporter has done all things necessary on its part to cause the Payment Guarantee to be in full force and effect in accordance with its terms, and the Payment Guarantee has been duly and validly assigned to Assignee. The Exporter agrees not to change or agree to change any of the provisions or coverage of the Payment Guarantee without the prior written consent of the Assignee which consent will not be unreasonably withheld. Except for the assignment evidenced hereby, no other assignment of the Payment Guarantee or any rights thereunder has or will be made by Exporter.

. . .

(k)     The Exporter has complied and will continue to comply in a timely manner with all regulations and requirements of CCC so as to insure that the Payment Guarantee remains in full force and effect. The Exporter is, and will continue to be, an "Exporter" within the meaning of section 1493.410(l) of the Regulations.

(l) In the event that any amounts are received by the Exporter which should be paid over to CCC pursuant to the Regulations or otherwise, the Exporter will hold such amounts in trust and forthwith pay such amounts over to Assignee for distribution to CCC.

. . .

The NPAAs also contained an indemnification clause, providing that AWB (USA) was to indemnify Standard Chartered for losses, costs, expenses and damages arising from AWB (USA)'s false or misleading representations. And it contained a choice of law clause, providing that the substantive law of New York was to govern the contract.

> 5. <u>Indemnification.</u> (a) Exporter will indemnify and hold harmless Assignee from and against any and all losses, costs, expenses and other damages suffered by Assignee and directly arising from and caused by Exporter having made any statement herein which proves to have been false or misleading when made or deemed made or by Exporter's breach of any agreement made herein which, in either case, causes or results in less than 65% of the discounted amount being covered by the Payment Guarantee provided, however, the Assignee remains liable for its own gross negligence or willful misconduct (for the avoidance of doubt, such gross negligence or willful misconduct includes any breach by the Assignee of any of the regulations or requirements of the CCC).
>
> . . .
>
> 7. <u>Miscellaneous.</u>
>
> . . .
>
> (b) This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York without giving effect to the principles of conflict of law.

**Securing ANZ Bank for its Standby Letters of Credit**

Standard Chartered discounted the promissory notes given by the Indonesian importers, and advanced the full purchase price to AWB (USA), in exchange for the CCC guarantee and the standby letters of credit issued by ANZ Bank in favor of Standard Chartered. However, the party that actually procured the standby letters of credit issued by ANZ Bank was not AWB (USA), but its sister company, AWB (Geneva). That change in obligor, and its implications and consequences, are the cause of this lawsuit.

## The Collateral Securing ANZ Bank and its Guarantor, AWB (Geneva)

AWB (Geneva), in order to obtain standby letters of credit from ANZ Bank to protect Standard Chartered, was required to indemnify ANZ Bank in full.  In order to secure itself, AWB (Geneva) took collateral from the importers of the soybeans they had purchased from AWB (USA) sufficient to pay ANZ Bank the full amount of the standby letters of credit.  AWB (Geneva) obtained its collateral, at first from a general business obligation given by the Indonesian importers and, later, by requiring the Indonesian importers to set aside the soybeans they had acquired from AWB (USA), or the cash proceeds of sales of those soybeans[3] or, if the soybeans were slow to sell or if the price for them in Indonesia dropped, to substitute or add collateral in more recently acquired soybeans or other commodities.  On the first two of the twenty-eight transactions, in approximately August and September 2002, the importers paid cash collateral to AWB (Geneva) in connection with "general business obligations", and AWB (Geneva) used these funds to pay ANZ Bank.

AWB (Geneva) was not satisfied with this form of arrangement.  Its concern was that the collateral, even though expressed as a general obligation owed by the Indonesian importers to AWB (Geneva), nevertheless was susceptible to an interpretation of being tied to the contract of exportation and its financing and, therefore, to the CCC guarantee and the obligations of exporter and assignee to account to the CCC.  AWB (Geneva) feared that there could be recourse by the CCC against the collateral it took, leaving AWB (Geneva) exposed to loss.  According to testimony given by Simon Brotherton, former officer of AWB (Geneva) and acting during the events at issue in this lawsuit for all three of the AWB companies, AWB (Geneva) endeavored to eliminate what he called the "opacity" in the collateral

---

[3]   The cash proceeds were in the form of either rupiahs, the Indonesian currency, or dollars for which they might be exchanged.  No explanation was given why the importers would agree to encumber their assets in favor of AWB (Geneva), a stranger to their contracts of importation.

obligations.  Brotherton set out to create a greater "transparency", by which he meant that the

collateral should be tied to an independent obligation of the importers to AWB (Geneva) and,

because of such transparency, reduce the risk of recapture by the CCC.[4]

Beginning February of 2003, and for each of the next twenty-six transactions,

AWB (Geneva) obtained a letter of indemnity from the Indonesian importers, equivalent to its

exposure to ANZ Bank on outstanding letters of credit to Standard Chartered.  The collateral

from the Indonesian importers, instead of securing AWB (Geneva)'s obligation to ANZ Bank,

was now drafted to secure the importers' letters of indemnity to AWB (Geneva).   AWB

(Geneva) considered that the change in form improved the "transparency" of the tie between the

collateral and an independent obligation of the importers to AWB (Geneva).   As Simon

Brotherton explained, the intended effect was to insulate all AWB entities from risk of loss

arising from obligations to the CCC.

> Q.   The whole point of this transparency and opacity was to try to
>       achieve a state of affairs that would have made AWBG whole
>       without having to account to the Commodity Credit
>       Corporation?
> A.   Yes.[5]

Brotherton emphasized that it was very important that collateral arrangements

would not be seen as a payment under the promissory note:  "[W]e linked it in a way that the

collateral would not be seen as a recovery under the promissory notes."[6]

It was the conscious and calculated decision of the AWB parent and both its

subsidiaries that AWB (Geneva), and not AWB (USA), secure ANZ Bank and tie up the

importers' collateral to gain insulation against the reach of the CCC.  As Simon Brotherton

testified, "[T]he particular transactions that we did, that are the subject of this case, [] AWB

---

[4]  Trial transcript at 397 (testimony of Simon Brotherton).
[5]  Id. at 397-98.
[6]  Id. at 336-37.

(Geneva)[] was utilized to issue those letters of credit so the exposure on the importer was left with AWB (Geneva)," and not AWB (USA).[7]

### The Importers' Defaults, the Liquidation of Collateral and Payments, and Self-Help by the CCC

In the spring of 2004, a squeeze in value of soybeans in the local Indonesian market occurred, due to a simultaneous oversupply in local markets and a substantial increase in futures prices on the Chicago Board of Trade. The squeeze resulted in defaults by the Indonesian importers on six outstanding promissory notes, in the amounts of (1) $8,308,368.89; (2) $10,532,778.97; (3) $24,165,369.78; (4) $16,643,619.71; (5) $26,906,909.32; and (6) $13,050,823.50—a total of $99,607,870.17.

As a result of the defaults, Standard Chartered drew on ANZ's standby letters of credit for 35 percent of the face value of the defaulted promissory notes. ANZ, having honored the standby letters of credit, made demand on AWB (Geneva). In consequence, AWB (Geneva) liquidated the collateral—cash and soybeans—set aside by the importers to secure their letters of indemnity, and paid ANZ Bank.

Standard Chartered then made demand on CCC for the 65 percent of the face values of the importers' notes that were federally guaranteed, in the amounts of (1) $5,400,439.78; (2) $6,846,306.33; (3) $15,707,490.30; (4) $10,818,352.81; (5) $17,489,491.06; and (6) $8,483,035.27—a total of $64,745,115.55. Standard Chartered did not disclose that it had recovered the 35 percent balance from ANZ's standby letters of credit. The CCC was also not made aware that the exporter had arranged for a non-American sister company to become obligated to ANZ Bank to secure the standby letters of credit or of the layers of securitized collateral that supported that sister company's obligation.

---

[7] Id. at 310.

CCC paid the first two claims in full, and then, having become aware in the summer of 2004 of the standby letters of credit and the letters of indemnity, stopped payment and began an investigation. On December 23, 2004, CCC determined, and advised Standard Chartered, that, pursuant to 7 C.F.R. § 1493.520(b)(1), the recovery by Standard Chartered through the standby letters of credit constituted a "realization" upon assets and security pledged by the importers, and therefore "a recovery within the meaning of this regulation, and all amounts derived from such realization are properly payable to CCC."[8]

Pursuant to its determination and the underlying regulations, CCC set off its right to a 65 percent share of Standard Chartered's recovery: 65 percent against the 35 percent recovered by Standard Chartered, and remitted the balance on each of the six notes. Thus, CCC remitted to Standard Chartered: (1) $3,510,285.86; (2) $4,450,099.11; (3) $10,209,868.73; (4) $7,031,929.33; (5) $11,368,169.19; and (6) $5,513,972.93—a total of $42,084,325.93. Subtracted from the total principal demand of Standard Chartered ($64,745,115.55), Standard Chartered's deficiency of recovery came to $22,660,790.40. Standard Chartered received an additional $13,340.77 from the CCC based on additional recoveries from the importers. Adding interest of $1,212,326.07, from December 24, 2004 to November 20, 2007 (the last day of trial) to the amount of Standard Chartered's loss, the amount of deficiency sought by Standard Chartered at trial was $23,859,775.70.

---

[8] Section 1493.520(b)(1) provides: "In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee, from the importer or any other source whatsoever, such monies shall be immediately paid to the Treasurer, CCC."

CCC determined, pursuant to the regulation: "CCC views the realization upon such pledged assets and security as a recovery within the meaning of this regulation, and all amounts derived from such realization are properly payable to CCC."

## Procedural Posture

Standard Chartered filed its complaint in this Court on February 10, 2005, alleging claims for breach of warranty, misrepresentation and breach of indemnification. On September 15, 2005, I denied AWB (USA)'s motion to dismiss and Standard Chartered's cross-motion for summary judgment. On November 2, 2006, I denied Standard Chartered's motion to amend the complaint to add AWB (Geneva) as a defendant, for the addition of a foreign corporation would have destroyed diversity jurisdiction. On May 10, 2007, I denied the parties' cross-motions for summary judgment, finding that there were material issues of fact requiring trial. The parties appeared before me for a bench trial on the merits on November 13, 14, 15 and 19, 2007. I issued an extemporaneous oral ruling in favor of Standard Chartered on November 19, 2007. This written decision supplants my previous oral ruling. See R. 52(b), Fed. R. Civ. P.

## Jurisdiction

The Court has subject matter jurisdiction because of diverse citizenship, pursuant to 28 U.S.C. § 1332. The sum in controversy exceeds $75,000, exclusive of interest and costs, and the dispute, between Standard Chartered and AWB (USA), is between a citizen of a foreign state (the United Kingdom), and a citizen of Delaware and Oregon.

## Discussion, Findings of Fact and Conclusions of Law

Through the NPAAs, Standard Chartered contracted, in exchange for a modest discount of the value of the promissory notes, for the right to receive no less than 65 percent of the value of the promissory notes. Article 3(d) provides:

> The Payment Guarantee affords coverage in an amount equal to not less than 65% of the dollar value of the documents presented with the Note which represent the unpaid port value of the commodity or commodities being exported; and the amount to be discounted by the Assignee will not exceed the unpaid port value of the related export commodity.

13

Pursuant to this provision, AWB (USA) represented that Standard Chartered would receive a minimum of 65 percent from the CCC guarantees assigned via the NPAAs.

By law and by contract, both AWB (USA) and Standard Chartered accepted an obligation to share recoveries from the importer, or "from any other source," with the CCC.

> In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee from the importer or any other source whatsoever, such monies shall be immediately paid to the Treasurer, CCC.

7 C.F.R. § 1493.520(b)(1). That same obligation was reflected in the NPAAs between AWB (USA), styled "the Exporter" in the contract, and Standard Chartered, styled "the Assignee."

> "In the event that any amounts are received by the Exporter which should be paid over to CCC pursuant to the Regulations or otherwise, the Exporter will hold such amounts in trust and forthwith pay such amounts over to Assignee for distribution to the CCC."

NPAA, Art. 3(l). Thus, both AWB (USA) and Standard Chartered undertook to share with the CCC all sums recovered from the importer, or from the importer's business and assets, or from any other source whatsoever, that could be fairly attributable to the importer or the importer's payment obligations. The agreed ratio of sharing was 65 percent to the CCC and 35 percent to the Exporter or Assignee, AWB (USA) or Standard Chartered, respectively, according to their respective interests. Since the Exporter, AWB (USA), had assigned its entire 35 percent share to Standard Chartered, Standard Chartered became entitled to share recoveries with the CCC.

Standard Chartered agreed to accept AWB (USA)'s assignment without recourse, that is, without the normal assignor's guarantee of the obligor's promise to pay the promissory notes when due. Instead, AWB (USA) agreed to arrange a letter of credit in favor of Standard Chartered from a bank acceptable to Standard Chartered.

The Exporter shall arrange to be issued a Standby Letter of Credit ("SBLC") in favor of the Assignee and issued by a bank or financial institution acceptable by the Assignee.

NPAA, Amend. 1. Thus, AWB (USA) substituted guarantee obligations of ANZ Bank to Standard Chartered, in lieu of its own guarantees. However, both by contract and under law, AWB (USA) remained obligated not to impair Standard Chartered's reasonable expectations in accepting ANZ Bank's guarantee in place of AWB (USA)'s guarantee.

AWB (USA) knew that Standard Chartered had not assumed a risk of nonpayment when it discounted the importers' promissory notes. Standard Chartered's discount was less than 1/2 percent (45 basis points) added to LIBOR, a discount that reflect an expectation of payment in full at the 180-day due date, either from the importers on their promissory notes or from the sum of the CCC guarantee and the ANZ letter of credit. Thus, AWB (USA) gained the benefit of being paid almost the full selling price, immediately on sale of soybeans. In order to gain that commercial benefit, AWB (USA) assigned to Standard Chartered the CCC's guarantee of 65 percent of the sales price and arranged for ANZ's letter of credit for the 35 percent balance. AWB (USA) covenanted that it had complied with CCC requirements and had taken all steps necessary to secure the CCC guarantee. NPAA, Arts. 3(c), (g). As noted above, AWB (USA) represented to Standard Chartered that the payment guarantee assigned via the NPAAs afforded coverage of not less than 65 percent, NPAA, Art. 3(d), and by amendment to the NPAAs, AWB (USA) assured Standard Chartered that it would arrange for the issuance of standby letters of credit as a condition precedent to the execution of the agreements.

However, AWB (USA) did not reveal to Standard Chartered—and Standard Chartered failed to come to the realization on its own—that its arrangements risked a material impairment of the protections that AWB (USA) had assigned to Standard Chartered and which

were the basis of the bargain that advanced the full sales price to AWB (USA).  ANZ Bank did

not agree to issue its letter of credit to Standard Chartered before obtaining full security for itself,

for ANZ Bank had no more than a financing interest in the transaction and that did not justify a

guarantee of the importers' promissory note and an assumption of the risk of their non-payment.

AWB (USA) had the interest of the seller in the transaction, and it would be the natural party to

secure ANZ Bank.  AWB (USA) did so by arranging for its sister-company in Switzerland,

AWB (Geneva), to provide that security.  AWB (Geneva) covered its own obligation by taking

security from the importers, first in connection with a general business obligation of the

importers to AWB (Geneva), and later to secure a letter of indemnity from the importers to AWB

(Geneva).  Through the letters of indemnity, AWB (Geneva) sought to create an obligation

which was distinct from, and superior to, the importers' obligations under the promissory

notes—indeed, by tying both the soybeans imported from AWB (USA) (and other importers) and

cash sales of those soybeans, the importers had little or nothing left with which to pay AWB

(USA), or its assignee, Standard Chartered, and, through AWB (USA) and Standard Chartered,

the CCC.

It is true that the terms of the letters of indemnity explicitly state that the security

pledged pursuant to its terms do not "discharge, either in full or in part, . . . any obligation under

the aforementioned promissory note or the sale contract."  Simon Brotherton proposed, by such a

term, to separate the importers' obligations under the letters of indemnity given to AWB

(Geneva), from the importers' obligations given on the promissory notes to pay for the soybeans

provided from, and owed to, AWB (USA), and to Standard Chartered as assignee.  Under the

terms of the letters of indemnity, the importers agreed to indemnify AWB (Geneva), as

evidenced by the pledged collateral, "in consideration of your [AWB (Geneva))'s] furnishing to

SCBNY a standby letter of credit in such form as SCBNY may require pursuant to the terms of the NPAA." Under the terms of the promissory notes, the importers agreed to pay the purchase price to the seller, AWB (USA), and its assignee, Standard Chartered. But, in reality, the two obligations stemmed from one transaction, and cannot be understood in any other way.

One may ask, why the importers reasonably would agree to indemnify AWB (Geneva) against the risk of default and consequent risk of loss from the standby letter of credit arrangement, when they already were obligated to a greater extent under their promissory notes to AWB (USA). Why would the importers accept, in essence, a 135 percent obligation for the convenience of AWB (Geneva), when AWB (Geneva) was not a party to the contract of importation between AWB (USA) and the Indonesian importers? The importers could be expected to accommodate an assignment between AWB (USA) to Standard Chartered, but not to incur two separate and independent obligations, one to AWB (USA), and a second to AWB (Geneva). The importers gained no benefit from AWB (Geneva)'s arrangements, except as a substitute for AWB (USA). AWB (Geneva) and AWB (USA), as they decided between them, were the true beneficiaries of the financing arrangements made with ANZ Bank, and it was they, separately or together, who should be expected to incur the risk of loss on the standby letters of credit issued by ANZ Bank.

AWB (USA) was the party to the contract with Standard Chartered. Although AWB (USA) assigned the CCC guarantee without recourse, it could not escape from, or avoid, its representations. And, as will soon be discussed, it could not engage in stratagems to burden and defeat Standard Chartered's reasonable expectations. It could not give its sister company, AWB (Geneva) the right to give itself superior rights to the importers' payment obligations, jeopardizing Standard Chartered's right to payment under the NPAAs and the CCC's rights of

recourse to recover the costs of its guarantee. The effect of these stratagems by AWB (USA) was to allow its sister company, AWB (Geneva), to appropriate the cash and soybeans of the importers as security for its obligation to ANZ Bank, in derogation of the rights and security to which Standard Chartered and the CCC were entitled. These tactics, if not precisely meeting the definition of fraud, amount to something very much like it.[9]

When the CCC discovered this arrangement, the CCC asserted its own overriding interest to the recovery. It determined that the standby letter of credit to Standard Chartered was supported by the importers' cash and soybeans, and that Standard Chartered's recovery, albeit from the standby letter of credit, was a recovery to which the CCC was entitled, to the extent of 65 percent of such recovery. The CCC took recourse against the most convenient source: its own guarantee obligation to Standard Chartered, as assignee of AWB (USA), holding back so much of its guarantee as equaled 65 percent of the sums received by Standard Chartered from ANZ's letter of credit.

At this point, AWB (USA) was whole, having been paid in full by Standard Chartered when Standard Chartered discounted the importers' 180-day notes less LIBOR plus a half- percent; AWB (Geneva) was made whole, having liquidated the cash and soybeans pledged by the importers, thereby repaying itself for the amounts it paid to ANZ Bank. Standard Chartered, however, instead of being fully secured by the CCC 65 percent guarantee and the ANZ 35 percent letter of credit as it had reasonably expected, was left with a loss of $22,647,449.63, plus interest in the amount of $1,212,326.07, for a total of $23,859,775.70.

---

[9] Standard Chartered urges the Court to find that AWB (USA) was acting in all respects as agent for an undisclosed principal—AWB (Geneva)—and that in consequence, the liquidation of collateral by AWB (Geneva) should be attributed to AWB (USA) and the obligation of AWB (USA) to pay the sums thus liquidated to the CCC under the regulations, and to Standard Chartered as trustee for the CCC under the NPAAs. I decline to adopt Standard Chartered's characterizations. In my view, AWB (USA) could not frustrate the reasonable expectations of its promise, Standard Chartered, or its fiduciaries, the CCC, by the stratagems it permitted AWB (Geneva) to employ.

It is axiomatic that while a party may freely assign its rights under a contract and as a result, lose any interest in those rights, it remains liable when it delegates its duties to a third party. Farnsworth on Contracts § 11 (3d ed. 2004). As the Second Circuit stated the rule, "It is true, of course, as a general rule, that when rights are assigned, the assignor's interest in the rights assigned come to an end. When duties are delegated, however, the delegant's obligations do not come to an end. . . . The act of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed." Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 924 (2d Cir. 1977). Although the notes assigned to Standard Chartered were without recourse to AWB (USA), AWB (USA) could not undermine the integrity of the rights it assigned to Standard Chartered by interposing its sister company in Switzerland, AWB (Geneva). If, as is clear, AWB (USA) owed recoveries from importers to the CCC and to Standard Chartered, it could not evade its duty by allowing its sister company to interpose itself between the importers and their obligees, and appropriate rights belonging, ultimately, to Standard Chartered and the CCC.

Simon Brotherton, the former official of the AWB companies in charge of developing these arrangements, understood that their central purpose was to defeat the CCC's right to the importers' collateral.[10] By trying to defeat the CCC, AWB (USA) was trying to defeat as well the rights of Standard Chartered, for the letter of credit that secured Standard Chartered against the risk of the importers' non-payment could not effectively constitute a guarantee if the CCC was given the condition to offset against its own guarantee obligations to Standard Chartered. And that which AWB (USA) was contractually unable to do itself, it could not accomplish by interposing a sister company, AWB (Geneva). It is not a matter of piercing

---

[10] Trial transcript, at 397-98: "Q: The whole point of this transparency and opacity was to try to achieve a state of affairs that would have made AWBG whole without having to account to the Commodity Credit Corporation?" "A: Yes."

corporate veils, as the parties at trial have suggested and repeat in their post-trial motions.  It is a

matter of requiring a party to a contract to honor the contract and its covenants and not attempt to

defeat assigned rights by interjecting an affiliated company.

Standard Chartered, as well as AWB (USA), was entitled to the benefit of its

bargain.  See Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236, 239 (6th Cir. 1994) ("The essence

of contract law is the bargain: parties of equivalent bargaining power negotiate the terms of the

transaction and each is then entitled to the benefit of the bargain.").  Neither had the right to

undermine the other's reasonable expectations, or to make performance more difficult, for "there

exists an implied covenant of good faith and fair dealing" in every contract.  Lowell v. Twin

Disc, Inc., 527 F.2d 767, 770-71 (2d Cir. 1975) (applying New York law).

> It is a fundamental principle of law that in every contract there
> exists an implied covenant of good faith and fair dealing.
> Furthermore, each contract contains an implicit understanding that
> neither party will intentionally do anything to prevent the other
> party form carrying out his part of the agreement.  Persons
> invoking the aid of contracts are under an implied obligation to
> exercise good faith not to frustrate the contracts into which they
> have entered.  It is likewise implied in every contract that there is a
> duty of cooperation on the part of both parties.

See also Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980) ("In every contract, there is an

implied covenant of good faith and fair dealing which precludes each party from engaging in

conduct that will deprive the other party of the benefits of their agreement") (internal citations

and quotation marks omitted) (applying New York law); Kirke La Shelle Co. v. Paul Armstrong

Co., 188 N.E. 163, 187 (N.Y. 1933) ("[I]n every contract there is an implied covenant that

neither party shall do anything which will have the effect of destroying or injuring the right of

the other party to receive the fruits of the contract."); Farnsworth on Contracts § 7.17b (3d ed.

2004) ("The implied covenant [of good faith] enjoins each party 'to do nothing destructive of the

other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish this purpose." (quoting <u>Conoco v. Inman Oil Co.</u>, 774 F.2d 895, 908 (8th Cir. 1985)).

<u>Lowen v. Tower Asset Management</u>, 829 F.2d 1209, 1220 (2d Cir. 1987), is instructive.[11]  The case involved allegations of breach of fiduciary duty under ERISA due to self-dealing transactions, effected, both by a corporate manager, who was a "fiduciary" under the plan, and by a related investment banking corporation, a related broker-dealer corporation, and their common individual owners.  The related corporations and the common owners appealed a judgment for plaintiff, claiming that they had no liability under ERISA because they were not fiduciaries.  The Court of Appeals held that the separate corporate form of the non-fiduciaries was irrelevant in light of the importance of giving effect to ERISA's broad purpose.   A fiduciary cannot evade its obligations as a fiduciary by interposing an affiliated corporation to do that which it, itself, cannot do.  Quoting from <u>First National City Bank v. Banco Para el Comercio Exterior de Cuba</u>, 462 U.S. 611, 630 (1983), the Court of Appeals held that  "corporate form [cannot be] interposed to defeat legislative policies."  Continuing, the Second Circuit ruled:

> Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control."  <u>Id.</u>

AWB (USA) understood that Standard Chartered had not assumed the risk of importers' non-payments, and that the purpose of the ANZ Bank-issued standby letter of credit was to assure that it would be secured in full over and above the CCC 65 percent guarantee.

---

[11]   <u>Lowen v. Tower Asset Management</u> was decided by a federal court under a federal statute, ERISA.  But that does not mean that a state court would not incorporate its principles as a matter of state substantive law.  <u>Lowen</u> is consistent with New York substantive law, as described in the previous paragraphs in the text and, I hold, is expressive of New York State contract principles, and would be followed by a New York court.  The post-trial arguments of AWB (USA), seeking to argue that because the choice of law clause of the contract provides that New York substantive law governs, <u>Lowen</u> is inapplicable, are not meritorious.  <u>Cf. O'Melveny & Myers v. FDIC</u>, 512 U.S. 79 (1994) (holding that there is no federal common law).  There is no conflict between <u>Lowen</u> and New York substantive law.

Although AWB (USA)'s assignment to Standard Chartered was "without recourse," that provision affected the status of AWB (USA) as guarantor, and not its duty to cooperate and not interfere with Standard Chartered's reasonable contract expectations. AWB (USA) breached its duty of cooperation and caused Standard Chartered to be deprived of its reasonable expectation to enjoy both the CCC guarantee for 65 percent of the price, and ANZ Bank's 35 percent guarantee of the balance.

In consequence, the CCC offset $22,660,790.40 against its own guaranty obligation to Standard Chartered, as Assignee of the notes made by the importers to AWB (USA). The CCC later remitted to Standard Chartered an additional $13,340.77 received from the importers after December 2004, reducing Standard Chartered's loss to $22,647,449.63. For the reasons discussed in this Opinion, AWB (USA)'s breach of contract caused this loss, and Standard Chartered may recover that amount, $22,647,449.63, from it, plus interest of $1,212,326.07 through November 20, 2007, for a total of $23,859,775.70 plus interest thereafter and costs.

During my oral rulings, I ordered that AWB (USA) would be required to turn over a greater sum—approximately $34.86 million—to Standard Chartered, part of which would be held in trust for CCC and part of which would be retained by Standard Chartered. Upon further reflection, I have determined that AWB (USA) owes no more to Standard Chartered, as a judgment in this lawsuit, than the $23,859,775.70, plus interest since November 20, 2007. The CCC is a non-party to this action, and as such, recovery will not be ordered on its behalf. Whatever remaining losses the CCC might have will have to be vindicated in another claim or lawsuit where those losses are put in issue.

Standard Chartered's request for attorney fees pursuant to Article 5(a) of the NPAA is denied. Article 5(a), the indemnification provision of the NPAAs, provides:

> Exporter will indemnify and hold harmless Assignee from and against any and all losses, costs, expenses and other damages suffered by Assignee and directly arising from and caused by Exporter having made any statement herein which proves to have been false or misleading when made or deemed made or by Exporter's breach of any agreement made herein which, in either case, causes or results in less than 65 percent of the discounted amount being covered by the Payment Guarantee provided, however, the Assignee remains liable for its own negligence or willful misconduct (for the avoidance of doubt, such gross negligence or willful misconduct includes any breach by the Assignee of any of the regulations or requirements of the CCC).

I find that Standard Chartered, with more careful review of the structure leading to the ANZ Bank letter of credit, could have asked the questions that would have enabled it to detect the arrangements at issue in this lawsuit, and that it should have created better safeguards for itself and the CCC. A party in the position of Standard Chartered has the obligation not only to satisfy itself with its own protection, but also to further inquire into the structure of the financing arrangements to ensure that the rights of the CCC would not be compromised. Standard Chartered was in a position akin to a fiduciary to the CCC by virtue of the regulations. In light of the sums involved and special obligations imposed on Exporter and Assignee by government regulations to protect the federal fisc, Standard Chartered does not deserve to benefit from the fee shifting provisions of Article 5(a). Standard Chartered's actions with regard to its failure to inquire are the equivalent of negligence, disentitling Standard Chartered to recovery of attorney fees pursuant to Article 5(a), particularly in light of the normal American rule that each party should absorb its own legal expense. United States v. 110-118 Riverside Tenants Corp., 5 F.3d 645, 646 (2d Cir. 1993).

## Conclusion

For the reasons stated in this opinion, I order that judgment be entered in favor of Standard Chartered Bank and against AWB (USA), Ltd., in the amount of $23,859,775.70, plus additional interest from November 20, 2007 to the present, and costs. The parties post-trial motions, to the extent not incorporated into this revised ruling, are denied. The Clerk shall enter judgment accordingly.

SO ORDERED.

Dated:     January 30, 2008 as of January 14, 2008
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge