UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
STANDARD CHARTERED BANK, :
: **PRELIMINARY RESPONSE OF**
Plaintiff, : **DISTRICT COURT TO**
: **REMAND**
-against- :
: 05 Civ. 2013 (AKH)
AWB (USA) LTD., :
:
Defendant. :
:
:
-------------------------------------------------------------- x
ALVIN K. HELLERSTEIN, U.S.D.J.:

      The following is my preliminary response to the Court of Appeals mandate issued September 22, 2009, asking for additional explanatory information and findings. The parties are invited to comment according to the schedule set out at the end of this document.

      Because of the extensive pre-trial discovery and testimony at trial, no new evidence needs to be presented. If either party proposes to open the record, that party shall identify, in its submission, the specific information it proposes to add to the record, how it proposes to add such information, and why it was not previously made part of the record.

      A Second Amended opinion will be issued following the parties' submissions, and the opinion and response (modified as appropriate) will be filed and transmitted to the Court of Appeals in response to its mandate.

1. Question by the Court of Appeals: What exactly are the actions or omissions of the defendant and/or its Geneva affiliate which form the basis of the court's finding of

1

breach of contractual obligations to Standard Chartered? If the court finds that the defendant or its affiliate misrepresented, concealed, or withheld information, exactly what was the information misrepresented concealed, or withheld? Specify, if possible, what exactly were the communications that misrepresented, concealed, or withheld the information.

Response:

a. AWB (USA) Ltd. covenanted to Standard Chartered that it would "maintain[] in force" the Commodity Credit Corporation's ( "CCC ") 65 percent payment guarantee of the importers' payment obligations to Standard Chartered. See, e.g., Note Purchase and Assignment Agreement 1, Pl.'s Ex. 9, Joint Appendix at 871, ¶ 3(c); Standard Chartered Bank v. AWB (USA) Ltd., No. 05 Civ. 2013 (AKH), 2008 WL 144698, at *3-4 (S.D.N.Y. Jan. 14, 2008).  AWB (USA) impaired the payment guarantee, thus breaching it, by authorizing its affiliate, AWB (Geneva), to appropriate the goods that had been exported on the strength of the guarantee to secure AWB (Geneva)'s independent obligation to ANZ Bank.  Since Brotherton acted for both AWB (Geneva) and AWB (USA), his actions for one constituted authorization for his actions for the other.  When ANZ Bank drew on that security, thus reducing the funds available in normal course to pay AWB (USA) (or its assignee) and CCC, CCC reduced, in proportional measure, its guarantee obligation to Standard Chartered.  The reduced payment guarantee to Standard Chartered was the direct consequence of AWB (USA)'s breach.

2

b. AWB (USA) knew that Standard Chartered required a letter of credit in addition to the CCC payment guarantee, covering the remaining 35 percent of the credit risk of the export transaction, and AWB (USA) agreed to procure that letter of credit. AWB (USA) accepted that the letter of credit was to be independent of any tie to the goods exported by AWB (USA) on the strength of the CCC guarantee. AWB (USA) so understood, because Standard Chartered had rejected Simon Brotherton's offer to give Standard Chartered a security interest in the goods that AWB (USA) had exported to cover Standard Chartered's 35 percent exposure after the CCC guarantee. Brotherton understood that Standard Chartered was unwilling to finance the AWB (USA) export transaction if it had to share the proceeds from sales of the imported goods with CCC, and that Standard Chartered had rejected Brotherton's offer of a security interest in order not to expose itself to a duty to share a collection flowing from the imported goods with CCC.[1] Rihs, acting for Standard

---

[1] As Simon Brotherton testified:

Q: [Standard Chartered] rejected the option of taking importer collateral?

A: Yes. . . .

Q: And Mr. Rihs told you that was precisely because Standard Chartered considered that if you took the importer collateral, you would be subject to sharing of the CCC, correct?

A: He was worried that if he took collateral directly from the importer, it would be considered a partial payment under the promissory note.

Q: And have to be shared with the CCC?

A: Might reduce the exposure in effect.

Q: And have to be shared with the CCC, correct?

The Court: Did he say that?

The Witness: I guess, yes, he said that.

3

      Chartered, told Brotherton, acting for AWB (USA) and AWB (Geneva), that any link between the letter of credit and the underlying transaction would result in Standard Chartered having to share with CCC, and that such sharing was unacceptable to Standard Chartered.[2]  It was upon this understanding between Rihs and Brotherton that Standard Chartered accepted a without-recourse assignment of the promissory notes from AWB (USA) and discounted them at LIBOR, without discount for any risk of loss.

c.   Simon Brotherton knew that Standard Chartered was concerned that any tie between the goods that AWB (USA) had exported on the strength of the CCC guarantee and the letter of credit would undermine the independence of the

---

Transcript at 407, Joint Appendix at 659.

[2] Rihs testified:

> The Witness:  My understanding was that . . . they have a risk structure in place where they reduced the risk with some of the collateral, it might be commodities, might be cash.  I didn't know exactly what the details are.  But my response to them was clearly – and I think throughout the transaction was always my position that if that collateral is linked to the underlying transaction, meaning the sale between . . . AWB (USA) and the buyer in Indonesia, that that portion has to be shared with the CCC.  That was always my view. . . .
>
> The Court:  . . . [D]id you consider that the risk mitigation policy exposed your bank to risk?
>
> The Witness:  No, I did not.  There was not – it was not my concern.  I looked at it that AWB (USA) did their own due diligence on the risk mitigation, and that basically . . . they would . . . by . . . the terms of our contract . . . and the representation warranties . . . share the collateral with us . . . so that we can pay it over to the CCC.
>
> The Court:  . . . [D]id you express this concern to Brotherton and Richardson?
>
> The Witness:  Yes, absolutely.
>
> The Court: What did they say to you?
>
> The Witness:  I felt that they understood the point, and I felt that they understood that the Standard Chartered Bank is not taking the risk on the buyer of this transaction, that AWB is taking it.

Transcript at 219-21, Joint Appendix at 471-73.

letter of credit that AWB (USA) had agreed to procure. He knew that Standard Chartered would enter into the agreement only if it were fully secured against risk of default.[3] Notwithstanding, and without informing Standard Chartered, Brotherton, on the part of both AWB (USA) and AWB (Geneva), had AWB (Geneva) collateralize the exported goods to secure and reimburse AWB (Geneva) if ANZ Bank had to honor its letter of credit to Standard Chartered. In this manner, the letter of credit in favor of Standard Chartered was paid by the goods that AWB (USA) had exported on the strength of the CCC guarantee.

d. CCC, exercising its right to share in the proceeds from the goods that AWB (USA) had exported – whether collected by AWB (USA) directly from the importers, or by Standard Chartered as the proceeds were transmuted into the payment of a letter of credit – took recourse by reducing its own payment guarantee in proportional amounts equivalent to its sharing rights in the goods that AWB (USA) had exported to the defaulting Indonesian importers.

e. AWB (USA), by allowing the goods it had exported to pay for the letters of credit given to Standard Chartered, impaired the CCC 65 percent guarantee. AWB (USA) thus breached its covenant to maintain the CCC 65 percent payment guarantee "in force." AWB (USA) also breached the covenant of good faith and fair dealing implied in every contract under New York law, for the import of its activities was to injure "the right of the other party[, Standard

---

[3] Brotherton testified: "I knew at the time the bank wanted to fully secure itself and it was taking an assignment to the 65 percent SCGP guarantee and it was taking the 35 percent standby L/C, thereby considering itself whole and fully collateralized. So, you know, I understood." Transcript at 411, Joint Appendix at 663.

5

Chartered,] to receive the fruits of the contract." <u>511 West 232nd Owners Corp. v. Jennifer Realty Co.</u>, 98 N.Y.2d 144, 153 (2002).

2. Question by Court of Appeals: Was the information misrepresented, concealed, or withheld factual information about details of the transaction and the guarantee or information about rules of law, such as the legal rules governing the CCC's right of recoupment of its guarantee payments? If the information misrepresented, concealed or withheld was of the governing rules of law, do a contracting party's obligations of good faith and fair dealing under the circumstances of this case include an obligation to advise one's counterparty about the relevant rules of law, or to correct the counterparty's mistaken beliefs about the rules of law, of which the contracting party is aware?

   Response:

   a. AWB (USA) concealed from Standard Chartered that it had allowed its sister company, AWB (Geneva) to appropriate the exported goods by taking a security interest in them likely to affect directly CCC's payment guarantee by creating inter-dependence between the source of payment of the letter of credit to Standard Chartered and the note obligation to Standard Chartered (as assignee of AWB (USA)).

   b. AWB (USA), through Simon Brotherton, told Standard Chartered that AWB (Geneva) could perform AWB (USA)'s obligation to procure the letters of credit in favor of Standard Chartered, for AWB (Geneva) generally performed that function for AWB (USA). Brotherton failed to disclose to Standard Chartered that AWB (Geneva) would perform that obligation by creating a

collateral interest in the exported goods in its favor, and that these goods would be the source of payment to ANZ Bank when it honored its letter of credit to Standard Chartered. Brotherton concealed that the substitution of AWB (Geneva) for AWB (USA) was to enable the AWB companies, through AWB (Geneva), to avoid having to share proceeds with CCC, for if AWB (USA) had procured the letters of credit and secured its resulting exposure with the exported goods, it would have had to share any amount it collected from liquidation of the goods with CCC. This is because AWB (USA) remained subject to the CCC regulations even after its assignment of the CCC guarantee to Standard Chartered. 7 C.F.R. § 1493.520(b)(1) ("In the event that monies for a defaulted payment are recovered *by the exporter or the exporter's assignee* from the importer or any other source whatsoever, such monies shall be immediately paid to the Treasurer, CCC" (emphasis added)). If AWB (USA), through Brotherton, had not concealed its purpose for substituting AWB (Geneva) as the entity that procured the letters of credit, Standard Chartered would not have entered into the agreement with AWB (USA).

c. Brotherton's failure to make this disclosure was purposeful, to induce Standard Chartered not to object to AWB (Geneva) procuring the letter of credit. Brotherton's failure to make this disclosure made his disclosure of AWB (Geneva)'s role misleading. [4]

---

[4] Rihs testified that Brotherton and Stuart Richardson, who was working with Brotherton,

> indicated that AWB (Geneva) or AWB (USA) could be the applicant on the standby letters of credit. And if that would be an issue – if I would see a problem with that, I did not, because . . . I

7

3. Question by Court of Appeals: Was the defendant or its affiliate aware that Standard Chartered had a mistaken belief about the facts of, or the rules governing, the transaction? How did it become aware of Standard Chartered's mistaken beliefs?

   Response:

   a. Brotherton, acting for both AWB (USA) and AWB (Geneva), was aware that Rihs of Standard Chartered believed that CCC's ability to recover proceeds from the sale of the exported goods upon any importer default would not be affected if he agreed to Brotherton's request that AWB (Geneva) procure the letter of credit in favor of Standard Chartered.[5]

   b. Brotherton did not advise Rihs that AWB (USA) and AWB (Geneva) had, by this arrangement, caused an inter-dependence between the letter of credit and the CCC guarantee, for the same imported goods became the source of payment of both the note assigned to Standard Chartered (and guaranteed to the extent of 65 percent by CCC) and ANZ Bank's letter of credit to Standard Chartered.

4. Question by Court of Appeals: Would the furnishing of that additional information, which the court finds was wrongfully misrepresented, concealed or withheld, have altered Standard Chartered's decision to enter into the contract?

---

   was more concerned [with] who is the issuing bank on the letter of credit? That was my main issue on that side. . . .

   Q: . . .[D]id you say that . . . Standard Chartered Bank would prefer to have AWB Geneva be the applicant for the standby letter of credit?

   A: Nope.

Transcript at 218, Joint Appendix at 470.

[5] See supra notes 1-3.

8

Response:

a. If Standard Chartered had known that AWB (Geneva) would use the exported goods to collateralize AWB (Geneva)'s risk resulting from its procurement of the letter of credit, Standard Chartered would not have entered into the financing transaction with AWB (USA).

b. Peter Rihs, acting for Standard Chartered, knew, and expressed his concern to Brotherton, that if the letters of credit were tied to the exported goods, any recovery would have to be shared with CCC and the CCC guarantee would have lessened force and effect.[6] If Brotherton had not concealed that AWB (USA) and AWB (Geneva) had tied the exported goods to the letters of credit, Standard Chartered would not have accepted the assignment of the note from AWB (USA).

5. Question by Court of Appeals: What findings, if any, does the district court make regarding the testimony of Mr. Rihs and of Mr. Brotherton, and any inconsistencies between them, about the information communicated to Standard Chartered during the contract negotiations, especially with regard to Standard Chartered's knowledge of AWB (Geneva)'s receipt of collateral from the importers? See, e.g., J.A. 470-76, 516-18 (Rihs testimony); J.A. 577-79, 652 (Brotherton testimony).

Response:

a. Brotherton testified that he believed that Rihs was aware that the collateral "was being taken," but admitted that he told Rihs nothing "of the specifics."[7]

---

[6] See supra note 2.

> Thus, Brotherton's testimony as to Rihs's mental state was conclusory. There was no conversation or other communication in the record that could be the basis of Brotherton's speculation as to what was in Rihs's mind.
>
> b. Rihs testified that although he was aware that AWB (Geneva) had some "risk mitigation in place," he was not aware and did not know that it was tied to the exported goods.[8] I find that testimony credible, and corroborated by the testimony of both Brotherton and Rihs to the effect that Standard Chartered would not have entered into the financing transaction if it believed that there was a tie between the source of payment for the letter of credit and the source of payment of the promissory note. (See first response, above). Both Brotherton and Rihs testified that Standard Chartered expected to be fully secured against the risk of default.[9]
>
> c. I find that Brotherton's statement about Rihs's supposed knowledge regarding the collateral lacks credibility, that Rihs's testimony is credible, and that Standard Chartered was not aware that AWB (USA) had allowed AWB (Geneva) to tie the exported goods to the letters of credit.

6. Question by Court of Appeals: If the contract negotiations were exclusively between Standard Chartered and the defendant's Geneva affiliate, without participation by the defendant, clarify the basis for imposing liability on the defendant.

   Response:

---

[7] Brotherton testified, "Rihs knew that the collateral was being taken, but he didn't know the specifics about how it was being taken." Transcript at 400, Joint Appendix at 652.

[8] See supra note 2.

[9] See supra notes 1, 3.

a. Brotherton negotiated with Rihs as a representative of both AWB (USA) and AWB (Geneva), for AWB (USA) was otherwise unrepresented. It was Brotherton acting for AWB (USA) who negotiated the assignment of the CCC guarantee from AWB (USA) to Standard Chartered. And it was Brotherton—this time for AWB (Geneva)—who obtained the ANZ Bank letters of credit in favor of Standard Chartered. Brotherton, or a colleague at AWB (Geneva), acted for both AWB (USA) and AWB (Geneva) in collateralizing the exported goods to secure AWB (Geneva)'s exposure from the letters of credit.[10] AWB (USA) enabled AWB (Geneva)'s collateralization of the exported goods by allowing Brotherton to substitute AWB (Geneva) for AWB (USA) as the entity that procured the letters of credit.

\*\*\*

Any comments on this preliminary response shall be served and filed electronically and simultaneously, at noon, on January 20, 2010. Replies shall be served and filed electronically and simultaneously, at noon, on January 29, 2010. Courtesy copies shall be delivered to chambers promptly after filing.

SO ORDERED.

Dated:   December 28, 2009
         New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

---

[10] See, e.g., Plaintiff's ex. 21, Joint Appendix 913.

11