UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
STANDARD CHARTERED BANK,                  :     **AMENDED OPINION**
                                                  :     **INCORPORATING RESPONSES**
                          Plaintiff,    :     **TO COURT OF APPEALS**
    -against-                           :     **FOLLOWING REMAND**
                                                  :
AWB (USA) LTD.,                         :     05 Civ. 2013 (AKH)
                                                  :
                          Defendant.   :
                                                  :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       The health and welfare of the United States economy depends on a strong domestic

agriculture and substantial exports of its farm products.  The United States Department of Agriculture

furthers this policy by providing partial financial guarantees to exporters, thus sharing the risk of

non-payment with them.  This case, involving exports of soybeans to Indonesia, arises from

stratagems of private parties to take advantage of both the government guarantees and the payments

made by importers, without sharing those payments with the government as the law and the

governing contracts require.

       AWB (USA) Ltd., an American subsidiary of an Australian company, accepted the

benefit of Department of Agriculture guarantees to export shipments of soybeans to Indonesia.  It

financed the exports, as Department of Agriculture regulations permitted, by discounting the

importers' promissory notes with Standard Chartered Bank, an English bank licensed to do business

in New York City.  The methods by which AWB (USA) Ltd. first arranged to secure the bank against

loss, and then impaired those arrangements in relation to Department of Agriculture regulations, are

the tale of this lawsuit.

       Plaintiff Standard Chartered Bank filed this lawsuit in February 2005, seeking to

recover its loss of $22,660,790.40, plus interest, from defendant AWB (USA) Ltd.  After extensive

pre-trial proceedings, the case came on for trial before me, without a jury, on November 13, 14, 15

and 19, 2007.  At the conclusion of trial, on November 19, 2007, I delivered my decision extemporaneously, reciting extensive findings of fact and conclusions of law, and finding in favor of the plaintiff, Standard Chartered.

Following the close of trial, the parties submitted post-trial motions:  Standard Chartered made a motion to amend the findings and conclusions, and AWB (USA) made a motion for a new trial and for reversal of the Court's findings and conclusions.  On January 14, 2008, I issued a written decision, responding to the parties' post-trial motions and arguments, and reflecting further thinking on my part, which supplanted the rulings made on the record on November 19, 2007.

AWB (USA) appealed from the decision.  The Court of Appeals remanded, asking me to respond to a number of questions to clarify various of my findings and rulings.  This Opinion embodies my clarifications and expands on the Opinion dated January 14, 2008.  Also, and separately, I issue my specific responses to the questions the Court of Appeals posed.

## Summary of Decision

I hold, for the reasons stated in this decision, that defendant AWB (USA) Ltd. breached its contract with plaintiff Standard Chartered Bank, and that plaintiff is entitled to recover $23,859,775.70, inclusive of interest to November 20, 2007, plus interest thereafter and costs.

## The Parties

Standard Chartered Bank is an English bank, with its executive offices in London and several offices worldwide, doing business in New York State through its branch located and licensed here.  AWB (USA) Ltd. is a corporation incorporated in Delaware, with a principal place of business in Portland, Oregon.  Its parent, AWB Ltd., is an Australian company, based in Melbourne, Australia. AWB Ltd. established its American subsidiary to engage in the business of exporting American agricultural products and, as an American company, to be eligible for guarantee-subsidies by the United States Department of Agriculture.  See 7 C.F.R. § 1493.420(a)(4); 1493.410(a).  AWB Ltd., the Australian parent, also set up a Switzerland subsidiary, AWB (Geneva) SA, to arrange financing

for the exports made by its sister American company and, as will be seen, to shift the profits from the American to the Swiss subsidiary, thereby avoiding United States income taxes.

The Department of Agriculture guarantees were administered by a government-owned corporation, the Commodity Credit Corporation ("CCC").  The guarantees were regulated by an extensive set of regulations, known as the Supplier Credit Guarantee Program (SCGP), set out at 7 C.F.R. §§ 1493.400 et seq.  The purpose of the SCGP is to develop and expand United States agricultural exports and to encourage United States exporters to extend financing on credit terms to importers.  Id. § 1493.400(a)(1).  The SCGP is designed to assist "in cases where credit is necessary to increase or maintain U.S. exports to a foreign market and where private U.S. exporters would be unwilling to provide financing without CCC's guarantee."  Id. § 1493.400(a)(2).  "The program is targeted toward those countries where the guarantees are necessary to secure financing of the exports but which have sufficient financial strength so that foreign exchange will be available for scheduled payments."  Id.  By encouraging exports to multiple importers, including those with less creditworthy capacity, the U.S. policy of increasing agricultural exports is furthered.

**The U.S. Supplier Credit Guarantee Program**

For exporting arrangements that qualify for the SCGP, the CCC offers a 65 percent guarantee against the default of a foreign importer, thereby taking on a significant portion of the risk of default.  Id. § 1493.400(a)(3).  In exchange, the exporter, or the assignee of the exporter, must share any recoveries with the CCC, recovered "from the importer or any other source whatsoever," 65 percent to the CCC, and 35 percent to the exporter or the exporter's assignee:

> In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee from the importer or from any other source whatsoever, such monies shall immediately be paid to the Treasurer, CCC.

Id. § 1493.520(b)(1).

And, further, in the event that CCC makes recovery, from either the importer or the exporter, "or any other source whatsoever," CCC is to make the same allocation, keeping 65 percent for itself, and remitting 35 percent to the exporter, or the exporter's assignee:

> Recoveries made by CCC from the importer, and recoveries received by the CCC from the exporter, the exporter's assignee, or any other source whatsoever, will be allocated by CCC to the exporter or the exporter's assignee and to CCC on a pro rata basis . . . .

Id., § 1493.520(c).

### The Structure of the Transactions at Issue

The Indonesian importers of soybeans gave 180-day promissory notes to AWB (USA).  Simultaneously, AWB (USA) entered into several separate, but inter-dependent, arrangements:

1. AWB (USA) paid the American growers of the soybeans (or middle-men) the price of soybeans, f.o.b. the ship at the United States port of embarkation ("the f.o.b. price").

2. AWB (USA) sold the cargo to its sister company in Geneva, AWB (Geneva), essentially at cost (the f.o.b. price paid to the American grower).

3. Without any movement of cargo, AWB (Geneva) immediately sold back the cargo to AWB (USA), but with a profit to AWB (Geneva) added, and inclusive of the costs of the ocean voyage, insurance and freight; the price was expressed as cost and freight from the port of disembarkation in Indonesia (the c.&f. price).

4. AWB (USA) obtained the CCC's 65 percent guarantee.  Thus, the guarantee covered both the delivered costs of the exported soybeans borne by AWB (USA), and the profit of the exportation enjoyed by AWB (Geneva), to the extent of 65

percent of the face value of the 180-day promissory notes given by the importers.[1]

5.   AWB (USA) assigned the importers' promissory notes via Note Purchase & Assignment Agreements (NPAAs) at a discount to Standard Chartered, obtaining immediate full payment of the face value of the notes, less a finance fee equivalent to LIBOR plus a half-percent (the London Interbank Offered Rate plus 45 basis points).  The assignment was made on a without recourse basis.

6.   AWB (USA) also assigned and delivered to Standard Chartered the CCC guarantee and an undertaking to arrange for standby letters of credit covering the 35 percent balance of the face value of the importers' promissory notes.  An affiliate of AWB (USA), AWB (Geneva), secured the standby letters of credit. The standby letters of credit were issued by a bank acceptable to Standard Chartered, ANZ Banking Group Ltd., a major Australian bank with a branch operating in London.  Thus, Standard Chartered obtained full security for 100 percent of the 180-day promissory notes given by the importers to AWB (USA), and assigned without recourse by AWB (USA) to Standard Chartered.

AWB (USA) and Standard Chartered Bank executed twenty-eight such transactions. Six of the transactions are at issue in this lawsuit.

## The Note Purchase and Assignment Agreements

AWB (USA) assigned the 180-day promissory notes given by the importers to Standard Chartered via the NPAAs, without recourse but subject to representations and warranties.

---

[1]   The consequence of the transactions was to remove profits, incurred within the United States and guaranteed by the United States, from the jurisdiction of the United States to a more benign taxing sovereignty outside the United States.  The trial testimony suggested that other grain exporters employed similar strategies to avoid United States taxes, after taking full benefit of United States government guarantees.

AWB (USA), as Exporter, represented and warranted to Standard Chartered, the Assignee, among other representations and warranties, that it "has complied and will comply" with CCC requirements for "obtaining" and "maintaining in force" the 65 percent payment guarantee, that the guarantee "affords coverage in an amount equal to not less than 65 percent of the dollar value" of the exported commodities, that it "has complied and will continue to comply in a timely manner with all regulations and requirements of CCC so as to insure that the Payment Guarantee remains in full force and effect" and that, in the event that it recovers payments from the importers, it will "hold such amounts in trust and forthwith pay such amounts over to Assignee for distribution to CCC."  In short, AWB (USA) represented and warranted to Standard Chartered that the CCC guarantee would remain in force at 65 percent of face value at maturity, and that such payments as it recovers from importers will be held by it in trust, via Standard Chartered, for the benefit of the CCC.  The relevant provisions are as follows:

> 3.     <u>Representations and Warranties.</u>     The Exporter hereby represents and warrants that:
>
> . . .
>
> (c)     Exporter has complied and will comply in all respects with the requirements of the Commodity Credit Corporation in obtaining, maintaining in force and assigning the Payment Guarantee (including without limitation, any such requirements arising after issuance and assignment of the Payment Guarantee).
>
> (d)     The Payment Guarantee affords coverage in an amount equal to not less than 65% of the dollar value of the documents presented with the Note which represent the unpaid port value of the commodity or commodities  being exported; and the amount to be discounted by the Assignee will not exceed the unpaid port value of the related export commodity.
>
> . . .
>
> (g)     The Exporter has paid, and will pay all fees due in connection with the Payment Guarantee and any amendment thereto, and the Exporter has done all things necessary on its part to cause the Payment Guarantee to be in full force and effect in accordance with its terms, and the Payment Guarantee has been duly and validly

assigned to Assignee. The Exporter agrees not to change or agree to change any of the provisions or coverage of the Payment Guarantee without the prior written consent of the Assignee which consent will not be unreasonably withheld. Except for the assignment evidenced hereby, no other assignment of the Payment Guarantee or any rights thereunder has or will be made by Exporter.

. . .

(k)     The Exporter has complied and will continue to comply in a timely manner with all regulations and requirements of CCC so as to insure that the Payment Guarantee remains in full force and effect. The Exporter is, and will continue to be, an "Exporter" within the meaning of section 1493.410(l) of the Regulations.

(l) In the event that any amounts are received by the Exporter which should be paid over to CCC pursuant to the Regulations or otherwise, the Exporter will hold such amounts in trust and forthwith pay such amounts over to Assignee for distribution to CCC.

The NPAAs also contained an indemnification clause, providing that AWB (USA) was to indemnify Standard Chartered for losses, costs, expenses and damages arising from AWB (USA)'s false or misleading representations. And it contained a choice of law clause, providing that the substantive law of New York was to govern the contract.

5.     <u>Indemnification.</u>     (a)   Exporter will indemnify and hold harmless Assignee from and against any and all losses, costs, expenses and other damages suffered by Assignee and directly arising from and caused by Exporter having made any statement herein which proves to have been false or misleading when made or deemed made or by Exporter's breach of any agreement made herein which, in either case, causes or results in less than 65% of the discounted amount being covered by the Payment Guarantee provided, however, the Assignee remains liable for its own gross negligence or willful misconduct (for the avoidance of doubt, such gross negligence or willful misconduct includes any breach by the Assignee of any of the regulations or requirements of the CCC).

. . .

7.     <u>Miscellaneous.</u>

. . .

7

      (b)      This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York without giving effect to the principles of conflict of law.

### Securing ANZ Bank for its Standby Letters of Credit

Standard Chartered discounted the promissory notes given by the Indonesian importers, and advanced the full purchase price to AWB (USA), in exchange for the CCC guarantee and the standby letters of credit issued by ANZ Bank in favor of Standard Chartered. However, the party that actually procured the standby letters of credit issued by ANZ Bank was not AWB (USA), but its sister company, AWB (Geneva). That change in obligor, and the implications and consequences of the actions taken by the changed obligor, are the cause of this lawsuit.

### The Collateral Securing ANZ Bank and its Guarantor, AWB (Geneva)

ANZ Bank, as a condition of extending letters of credit in favor of Standard Chartered, required full indemnification. AWB (Geneva) gave that indemnification, securing ANZ Bank against risk of loss on ANZ Bank's letters of credit to Standard Chartered. In turn, AWB (Geneva), in order to secure itself, took collateral from the importers of the soybeans that had been purchased from AWB (USA). First, AWB (Geneva) obtained the importers' general business obligation, later substituting the soybeans imported by the Indonesian importers from AWB (USA), or the cash proceeds of sales of those soybeans[2] or, if the soybeans were slow to sell or if the price for them in Indonesia dropped, substituted additional collateral from more recently acquired soybeans or other commodities. On the first two of the twenty-eight transactions, in approximately

---

[2]   The cash proceeds were in the form of either rupiahs, the Indonesian currency, or dollars for which they might be exchanged. No explanation was given why the importers would agree to encumber their assets in favor of AWB (Geneva), a stranger to their contracts of importation, nor was it clear that they appreciated that there were different AWB companies with which they were dealing.

August and September 2002, the importers paid cash collateral to AWB (Geneva) in connection with "general business obligations," and AWB (Geneva) used these funds to pay ANZ Bank.

AWB (Geneva) was not satisfied with this form of arrangement. Its concern was that the collateral, even though expressed as a general obligation owed by the Indonesian importers to AWB (Geneva), nevertheless was susceptible of an interpretation of being tied to the contract of exportation and its financing and, therefore, to the CCC guarantee and the obligations of exporter and assignee to account to the CCC. AWB (Geneva) feared that there could be recourse by the CCC against the collateral it took, leaving AWB (Geneva) exposed to loss. According to testimony given by Simon Brotherton, former officer of AWB (Geneva) and acting during the events at issue in this lawsuit for all three of the AWB companies, AWB (Geneva) endeavored to eliminate what he called the "opacity" in the collateral obligations. Brotherton set out to create a greater "transparency," by which he meant that the collateral should be tied to an independent obligation of the importers to AWB (Geneva) and, because of such transparency, reduce the risk of recapture by the CCC.[3]

Beginning February of 2003, and for each of the next twenty-six transactions, AWB (Geneva) obtained a letter of indemnity from the Indonesian importers, to back up AWB (Geneva)'s obligation of indemnity to ANZ Bank, on ANZ Bank's letters of credit to Standard Chartered. The collateral from the Indonesian importers, instead of securing AWB (Geneva)'s direct obligation to ANZ Bank, was now drafted to secure the importers' letters of indemnity to AWB (Geneva). AWB (Geneva) considered that the change in form, from direct to indirect security, improved the "transparency" of the tie between the collateral and an apparently independent obligation of the importers to AWB (Geneva). As Simon Brotherton explained, the intended effect was to try to insulate AWB from risk of loss arising from obligations to the CCC.

> Q. The whole point of this transparency and opacity was to try to
> achieve a state of affairs that would have made AWBG whole
> without having to account to the Commodity Credit Corporation?

---

[3]   Trial transcript at 397 (testimony of Simon Brotherton).

A.  Yes.[4]

Brotherton emphasized that it was very important that collateral arrangements would not be seen as a payment under the promissory note:  "[W]e linked it in a way that the collateral would not be seen as a recovery under the promissory notes."[5]

Brotherton's purpose in having AWB (Geneva), and not AWB (USA), secure ANZ Bank and tie up the importers' collateral was to shift risk from AWB (USA) to AWB (Geneva), and to insulate AWB (Geneva) against the reach of the CCC without advising or obtaining consent from Standard Chartered.  As Brotherton testified, "[T]he particular transactions that we did, that are the subject of this case, [] AWB (Geneva)[] was utilized to issue those letters of credit so the exposure on the importer was left with AWB (Geneva)," and not AWB (USA).[6]


**Negotiation of the NPAAs**

The transactions between Standard Chartered and AWB (USA) were negotiated by Simon Brotherton on behalf of AWB (USA) and AWB (Geneva), and Peter Rihs on behalf of Standard Chartered.  Brotherton, although an officer of AWB (Geneva), negotiated the assignment of the CCC guarantee to Standard Chartered on behalf of AWB (USA).[7]  No other representative of AWB (USA) took part in the negotiations.[8]  There is no evidence in the record of any advice or communication from Brotherton to anyone at AWB (USA).  AWB (USA) was to "be the signatory to the agreement[s]"[9] on the basis entirely of Brotherton's negotiation.  AWB (USA) was the "Exporter," and, as a domestic corporation, an indispensable party to the exportation and financing of the soybeans and the procurement and assignment of the CCC guarantee to Standard Chartered, and

---

[4]  Id. at 397-98.
[5]  Id. at 336-37.
[6]  Id. at 310.
[7]  Id. at 388-89, 390
[8]  Id.
[9]  Id. at 390.

AWB (USA) warranted to Standard Chartered that it would continue to be the "Exporter."[10]   AWB (USA) was the party that had assigned the importers' notes to Standard Chartered; AWB (USA) was under obligation to CCC; and AWB (USA), not AWB (Geneva), was Standard Chartered's counterparty.   AWB (USA) signed the agreements with Standard Chartered by one of its officers, but it was Brotherton, and only Brotherton, who negotiated on behalf of AWB (USA) and constructed the terms and conditions that AWB (USA) signed.   Brotherton had authority from AWB (USA) to negotiate the entire transaction.

Brotherton acted for both AWB (USA) and AWB (Geneva).   Brotherton obtained collateral from the importers to secure AWB (Geneva)'s exposure to ANZ Bank, but that could not have been done without Brotherton having acquiesced on behalf of AWB (USA).

AWB (USA) knew that Standard Chartered required a letter of credit in addition to the CCC payment guarantee, covering the remaining 35 percent of the credit risk of the export transaction, and AWB (USA) agreed to procure that letter of credit for Standard Chartered.[11]   AWB (USA) knew also, from Brotherton's negotiations with Rihs of Standard Chartered, that Standard Chartered was unwilling to finance the AWB (USA) export transaction if it had to share with CCC proceeds from sales of the imported goods or cash collateral.   Indeed, Standard Chartered rejected Brotherton's offer of such a security interest in order not to expose itself to having to share collections with CCC.[12]   Rihs, acting for Standard Chartered, told Brotherton, acting for both AWB

---

[10] NPAA ¶ 3(k).
[11] NPAA, Amend. 1 ("The Exporter shall arrange to be issued a Standby Letter of Credit ('SBLC') in favor of the Assignee and issued by a bank or financial institution acceptable by the Assignee.").
[12] As Simon Brotherton testified:

Q: [Standard Chartered] rejected the option of taking importer collateral?

A: Yes. . . .

Q:  And Mr. Rihs told you that was precisely because Standard Chartered considered that if you took the importer collateral, you would be subject to sharing of the CCC, correct?

companies, that any link between the letters of credit and the underlying transaction would result in

Standard Chartered having to share with CCC, and that such sharing was unacceptable to Standard

Chartered.[13]  It was upon this understanding between Rihs and Brotherton that Standard Chartered

accepted a without-recourse assignment of the promissory notes from AWB (USA) and discounted

them at LIBOR, without discount for any risk of loss.

Brotherton knew that Standard Chartered was concerned that any tie between the cash

collateral and the goods that AWB (USA) had exported on the strength of the CCC guarantee would

---

A: He was worried that if he took collateral directly from the importer, it would be considered a partial payment under the promissory note.

Q: And have to be shared with the CCC?

A: Might reduce the exposure in effect.

Q: And have to be shared with the CCC, correct?

The Court: Did he say that?

The Witness: I guess, yes, he said that.

Trial transcript at 407.
[13] Rihs testified:

The Witness:  My understanding was that . . . they have a risk structure in place where they reduced the risk with some of the collateral, it might be commodities, might be cash.  I didn't know exactly what the details are.  But my response to them was clearly – and I think throughout the transaction was always my position that if that collateral is linked to the underlying transaction, meaning the sale between . . . AWB (USA) and the buyer in Indonesia, that that portion has to be shared with the CCC.  That was always my view. . . .

The Court:  . . . [D]id you consider that the risk mitigation policy exposed your bank to risk?

The Witness:  No, I did not.  There was not – it was not my concern.  I looked at it that AWB (USA) did their own due diligence on the risk mitigation, and that basically . . . they would . . . by . . . the terms of our contract . . . and the representation warranties . . . share the collateral with us . . . so that we can pay it over to the CCC.

The Court:  . . . [D]id you express this concern to Brotherton and Richardson?

The Witness:  Yes, absolutely.

The Court: What did they say to you?

The Witness:  I felt that they understood the point, and I felt that they understood that the Standard Chartered Bank is not taking the risk on the buyer of this transaction, that AWB is taking it.

Id. at 219-21.

undermine the independence of the letter of credit that AWB (USA) had agreed to procure.  He knew that Standard Chartered would enter into the agreement only if it were fully secured against risk of default.[14]  Notwithstanding, and without informing Standard Chartered, Brotherton, on the part of AWB (USA) and AWB (Geneva), had AWB (Geneva) take the exported goods or cash collateral from the importers to secure the letters of credit.

Brotherton testified that he believed that Rihs was aware that collateral was being taken, but there is nothing in the record to support Brotherton's supposition.  Brotherton admitted that he told Rihs nothing of the specifics.[15]  Brotherton's testimony as to what he thought Rihs knew was conclusory and of little or no value.  There is nothing in the record—no conversation or other communication from Brotherton to Rihs—that could be the basis of Brotherton's speculation as to what was in Rihs's mind.  Brotherton's dealings with ANZ Bank and with the Indonesian importers were not communicated to Rihs, and were not known by Rihs.

Rihs testified that although he was aware that AWB (Geneva) had some "risk mitigation in place," he was not aware and did not know that it was tied to the exported goods.[16] That testimony was corroborated by the testimony of both Brotherton and Rihs to the effect that Standard Chartered would not have entered into the financing transaction if it believed that there was a tie between the source of payment for the letter of credit and the source of payment of the promissory note.  Both Brotherton and Rihs testified that Standard Chartered expected to be fully secured against the risk of default.[17]

Brotherton's failure to make proper disclosure to Rihs was purposeful, to induce Standard Chartered to finance the transactions.  Brotherton misled Rihs by requesting his consent to

---

[14] Brotherton testified:  "I knew at the time the bank wanted to fully secure itself and it was taking an assignment to the 65 percent SCGP guarantee and it was taking the 35 percent standby L/C, thereby considering itself whole and fully collateralized.  So, you know, I understood."  Id. at 411.

[15] Brotherton testified, "Rihs knew that the collateral was being taken, but he didn't know the specifics about how it was being taken."  Id. at 400.

[16] See supra note 13.

[17] See supra notes 12-14 and accompanying text.

substitute AWB (Geneva) for AWB (USA) as the procurer of the letters of credit, without disclosing that AWB (Geneva)'s arrangements with the importers had impaired the importers' capacity to use the proceeds of their importations to pay both their notes to Standard Chartered and AWB (Geneva). Brotherton's failure to disclose the arrangements he made with the importers made his statements to Rihs misleading.[18]  Brotherton concealed that the substitution of AWB (Geneva) for AWB (USA) was to enable the AWB companies to avoid having to share proceeds from the Indonesian importers with CCC, for if AWB (USA) had been the party that had procured the letters of credit from ANZ Bank and secured its indemnity to ANZ Bank as AWB (Geneva) had secured AWB (Geneva)'s indemnity, the amounts collected from the Indonesian importers would have had to be shared with CCC.  AWB (USA) remained subject to the CCC regulations even after its assignment of the CCC guarantee to Standard Chartered.[19]  The substitution of AWB (Geneva) for AWB (USA), and AWB (Geneva)'s appropriation of the importers' collateral, deceived Standard Chartered and, had it been successful, would have been a fraud on CCC.

> If AWB (USA), through Brotherton, had not concealed the purpose of substituting AWB (Geneva) for AWB (USA) as procurer of the letters of credit, Standard Chartered would not have agreed to finance the transaction.

---

[18] Rihs testified that Brotherton and Stuart Richardson, who was working with Brotherton,

> indicated that AWB (Geneva) or AWB (USA) could be the applicant on the standby letters of credit.  And if that would be an issue – if I would see a problem with that, I did not, because . . . I was more concerned [with] who is the issuing bank on the letter of credit?  That was my main issue on that side. . . .
>
> Q: . . .[D]id you say that . . . Standard Chartered Bank would prefer to have AWB Geneva be the applicant for the standby letter of credit?
>
> A: Nope.

Trial Transcript at 218.
[19] See 7 C.F.R. § 1493.520(b)(1) ("In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee from the importer or any other source whatsoever, such monies shall be immediately paid to the Treasurer, CCC").

### The Importers' Defaults, the Liquidation of Collateral and Payments, and Self-Help by the CCC

In the spring of 2004, a squeeze in value of soybeans in the local Indonesian market occurred, due to a simultaneous oversupply in local markets and a substantial increase in futures prices on the Chicago Board of Trade.  The squeeze resulted in defaults by the Indonesian importers on six outstanding promissory notes, in the amounts of (1) $8,308,368.89; (2) $10,532,778.97; (3) $24,165,369.78; (4) $16,643,619.71; (5) $26,906,909.32; and (6) $13,050,823.50—a total of $99,607,870.17.

As a result of the defaults, Standard Chartered drew on ANZ's standby letters of credit for 35 percent of the face value of the defaulted promissory notes.  ANZ, having honored the standby letters of credit, made demand on AWB (Geneva).  In consequence, AWB (Geneva) liquidated the collateral—cash and soybeans—set aside by the importers to secure their letters of indemnity, and paid ANZ Bank.[20]

Standard Chartered then made demand on CCC for the 65 percent of the face values of the importers' notes that were federally guaranteed, in the amounts of (1) $5,400,439.78; (2) $6,846,306.33; (3) $15,707,490.30; (4) $10,818,352.81; (5) $17,489,491.06; and (6) $8,483,035.27—a total of $64,745,115.55. Standard Chartered did not disclose that it had recovered the 35 percent balance from ANZ's standby letters of credit. AWB (USA) and AWB (Geneva) did not disclose the layers of securitized collateral emanating from the Indonesian importers that supported ANZ Bank's letter of credit.

CCC paid the first two claims in full, and then, having become aware in the summer of 2004 of the standby letters of credit and the underlying security, stopped payment and began an

---

[20] The importers' letters of indemnity directly indemnified AWB (Geneva) against any payments AWB (Geneva) made to ANZ Bank as a result of Standard Chartered's claims on the letters of credit.  See, e.g., Pl.'s Ex. 21, Letter of indemnification from importer P.T. Gerbang Cahaya Utama to AWB (Geneva)  ("[W]e hereby . . . undertake to indemnify you and hold you harmless against all and/or any consequences of issuing [the letter of credit to Standard Chartered] and to indemnify you in respect of any and all demands, claims and liabilities whatsoever you may incur under or in connection with the stand-by letter of credit."

investigation.  On December 23, 2004, CCC determined, and advised Standard Chartered, that, pursuant to 7 C.F.R. § 1493.520(b)(1), the recovery by Standard Chartered through the standby letters of credit constituted a "realization" upon assets and security pledged by the importers, and therefore "a recovery within the meaning of this regulation, and all amounts derived from such realization are properly payable to CCC."[21]

Pursuant to its determination and the underlying regulations, CCC set off its right to a 65 percent share of Standard Chartered's recovery: 65 percent against the 35 percent recovered by Standard Chartered, and remitted the balance on each of the six notes.  Thus, CCC remitted to Standard Chartered: (1) $3,510,285.86; (2) $4,450,099.11; (3) $10,209,868.73; (4) $7,031,929.33; (5) $11,368,169.19; and (6) $5,513,972.93—a total of $42,084,325.93. Subtracted from the total principal demand of Standard Chartered ($64,745,115.55), Standard Chartered's deficiency of recovery came to $22,660,790.40.   Standard Chartered received an additional $13,340.77 from the CCC based on additional recoveries from the importers.  Adding interest of $1,212,326.07, from December 24, 2004 to November 20, 2007 (the last day of trial) to the amount of Standard Chartered's loss, the amount of deficiency sought by Standard Chartered at trial was $23,859,775.70.

## Procedural Posture

Standard Chartered filed its complaint in this Court on February 10, 2005, alleging claims for breach of warranty, misrepresentation and breach of indemnification.  On September 15, 2005, I denied AWB (USA)'s motion to dismiss and Standard Chartered's cross-motion for summary judgment.  On November 2, 2006, I denied Standard Chartered's motion to amend the complaint to

---

[21]   Section 1493.520(b)(1) provides:  "In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee, from the importer or any other source whatsoever, such monies shall be immediately paid to the Treasurer, CCC."

CCC determined, pursuant to the regulation:  "CCC views the realization upon such pledged assets and security as a recovery within the meaning of this regulation, and all amounts derived from such realization are properly payable to CCC."

add AWB (Geneva) as a defendant, for the addition of a foreign corporation would have destroyed diversity jurisdiction.  On May 10, 2007, I denied the parties' cross-motions for summary judgment, finding that there were material issues of fact requiring trial.  The parties appeared before me for a bench trial on the merits on November 13, 14, 15 and 19, 2007.  I issued an extemporaneous ruling in favor of Standard Chartered on November 19, 2007.  On January 14, 2008, I issued a written decision supplanting my previous oral ruling.  See R. 52(b), Fed. R. Civ. P.  AWB (USA) appealed, and the Court of Appeals remanded, asking the district court to clarify various of its findings and rulings. This Opinion, and my separate responses, respond to the Court of Appeals remand.

## Jurisdiction

The Court has subject matter jurisdiction because of diverse citizenship, pursuant to 28 U.S.C. § 1332.  The sum in controversy exceeds $75,000, exclusive of interest and costs, and the dispute, between Standard Chartered and AWB (USA), is between a citizen of a foreign state (the United Kingdom), and a citizen of Delaware and Oregon.

## Discussion

In consideration for Standard Chartered's agreement to finance its exportations of soybeans to Indonesian importers, AWB (USA) assigned the importers' promissory notes to Standard Chartered without recourse, but subject to various representations and warranties expressed in a Note Purchase Agreement ("NPAA") between them.  Pursuant to their agreement, Standard Chartered was to discount the importers' notes essentially at face value less a modest financing fee (LIBOR plus half a percent), and without risk of loss from importers' defaults.  To avoid risk, AWB (USA) agreed to deliver to Standard Chartered guarantees by CCC of 65 percent of the face value, and independent bank guarantees in the form of standby letters of credit for the 35 percent balance.

Article 3(d) of the NPAA provides:

> The Payment Guarantee affords coverage in an amount equal to not less than 65% of the dollar value of the documents presented with the Note which represent the unpaid port value of the commodity or

> commodities being exported; and the amount to be discounted by the
> Assignee will not exceed the unpaid port value of the related export
> commodity.

Thus, AWB (USA) covenanted to deliver to Standard Chartered the CCC guarantee

of "65% of . . .the unpaid port value of the commodity or commodities being exported." In

consideration and by law and by contract, both AWB (USA) and Standard Chartered accepted an

obligation to share recoveries from the importer, or "from any other source," with the CCC.

> In the event that monies for a defaulted payment are recovered by the
> exporter or the exporter's assignee from the importer or any other
> source whatsoever, such monies shall be immediately paid to the
> Treasurer, CCC.

7 C.F.R. § 1493.520(b)(1).  That same obligation was reflected in the NPAAs between AWB (USA),

styled "the Exporter" in the contract, and Standard Chartered, styled "the Assignee."

> "In the event that any amounts are received by the Exporter which
> should be paid over to CCC pursuant to the Regulations or otherwise,
> the Exporter will hold such amounts in trust and forthwith pay such
> amounts over to Assignee for distribution to the CCC."

NPAA, Art. 3(l).  Thus, both AWB (USA) and Standard Chartered undertook to share with the CCC

all sums recovered from the importer, or from the importer's business and assets, or from any other

source whatsoever, that could be fairly attributable to the importer or the importer's payment

obligations.  The agreed ratio of sharing was 65 percent to the CCC and 35 percent to the Exporter or

Assignee, AWB (USA) or Standard Chartered, respectively, according to their respective interests.

AWB (USA) agreed also to arrange a letter of credit in favor of Standard Chartered

for the 35 percent portion of the "unpaid port value of the commodity or commodities being

exported," from a bank acceptable to Standard Chartered.

> The Exporter shall arrange to be issued a Standby Letter of Credit
> ("SBLC") in favor of the Assignee and issued by a bank or financial
> institution acceptable by the Assignee.

NPAA, Amend. 1.  Thus, AWB (USA), in lieu of the assignor's guarantee of payment, agreed to

deliver an acceptable equivalent – the guarantees of CCC and ANZ Bank of 65% and 35% of the

notes' face value, respectively and independently. Having thus agreed, AWB (USA) could not impair that which it agreed to deliver, or Standard Chartered's reasonable expectations from the agreement between them.

AWB (USA) knew that Standard Chartered had not assumed a risk of nonpayment when it discounted the importers' promissory notes.  Standard Chartered's discount was less than 1/2 percent (45 basis points) added to LIBOR, a discount that reflected an expectation of payment in full at the 180-day due date, either from the importers on their promissory notes or from the sum of the CCC guarantee and the ANZ letter of credit.  Thus, AWB (USA) gained the benefit of being paid almost the full selling price, immediately on sale of soybeans.  In order to gain that commercial benefit, AWB (USA) assigned to Standard Chartered CCC's guarantee of 65 percent of the sales price and arranged for ANZ's letter of credit for the 35 percent balance.  AWB (USA) covenanted that it had complied with CCC requirements and had taken all steps necessary to secure the CCC guarantee.  NPAA, Arts. 3(c), (g).  AWB (USA) represented also that the payment guarantee assigned via the NPAAs afforded coverage of not less than 65 percent, NPAA, Art. 3(d), and by amendment to the NPAAs, AWB (USA) assured Standard Chartered that it would arrange for the issuance of standby letters of credit as a condition precedent to the execution of the agreements. AWB (USA) warranted also that it is, and will continue to be, an Exporter.

However, AWB (USA) concealed from Standard Chartered that its substitution of AWB (Geneva) as the procurer of the letter of credit, or the arrangements made by AWB (Geneva) with ANZ Bank and the Indonesian importers, materially impaired the protections that AWB (USA) had assigned to Standard Chartered and which were the basis of the bargain that advanced the full sales price to AWB (USA).[22]  AWB (Geneva) secured its obligation to ANZ Bank by taking security

---

[22] AWB (USA)'s contention, that it was unaware that the arrangements would impair the guarantees assigned to Standard Chartered, is contradicted by the record.  An email sent by Richardson to the AWB parent specifically describes an arrangement that would shift risk to Standard Chartered.  Richardson proposed that (i) the exporter assign the importer's note and the guarantee without recourse to Standard Chartered in exchange for 100% payment,

from the importers, the soybeans they purchased from AWB (USA) but which they had not yet paid, or proceeds from their sale, or other cash or commodities.  First, the collateral secured the importers' general business obligation to AWB (Geneva), and then their letters of indemnity backing AWB (Geneva)'s indemnity obligation to ANZ Bank.  Although AWB (Geneva) sought to create an obligation which was distinct from the importers' obligations under the promissory notes, the capacity of the importers to pay both AWB (Geneva), and the promissory notes that AWB (USA) had assigned to Standard Chartered was impaired.  The importers, after paying AWB (Geneva) and funding ANZ Bank's letter of credit to Standard Chartered, had little or nothing left with which to pay AWB (USA), or its assignee, Standard Chartered, and, through AWB (USA) and Standard Chartered, the CCC.

It is true that the terms of the letters of indemnity explicitly state that the security pledged pursuant to its terms do not "discharge, either in full or in part, . . . any obligation under the aforementioned promissory note or the sale contract."  Simon Brotherton proposed, by such a term, to separate the importers' obligations under the letters of indemnity given to AWB (Geneva), from the importers' obligations given on the promissory notes to pay for the soybeans exported to them by, and owed to, Standard Chartered.  Clearly, had Brotherton disclosed that arrangement to Rihs, Standard Chartered would not have agreed to finance AWB (USA)'s exports.  An obligor cannot reasonably be expected to pay twice for the same merchandise.  AWB (USA)'s failure to disclose the arrangement premised on such a double payment, when it assigned the NPAA's to Standard

---

(ii) AWB (Geneva) arrange for a standby letter of credit in favor of Standard Chartered, and (iii) the importer provide collateral to secure the agreement of the AWB entities to supply commodities.  Richardson explained that because the collateral security could be offset against the risk on the standby letter of credit, it was not subject to sharing with the CCC.  As a result of this structure, Richardson stated, "it becomes Std. Chartered Bank that wears the risk on the Guarantee in the event of a default."  Pl.'s Trial Ex. 39.  Richardson sent this email on August 2, 2002—three days before the phone call Richardson and Brotherton made to Rihs in which they proposed the transactions which were later established.  See Trial Transcript at 219-21, 324-29.  The email makes clear that Brotherton and Richardson were aware that the arrangement would risk impairment of the CCC guarantee assigned to Standard Chartered.

Chartered with their 100% guarantee of the purchase price, was a deception, plain and simple, and cannot be understood in any other way.

AWB (USA) was the party to the contract with Standard Chartered.  Although AWB (USA) assigned the CCC guarantee without recourse, it could not escape from, or avoid, its representations that the CCC 65% guarantee and the ANZ Bank 35% guarantee were real and independent guarantees.  AWB (USA) could not give its sister company, AWB (Geneva), the right to give itself superior rights to the importers' payment obligations, jeopardizing Standard Chartered's right to payment under the NPAAs and the CCC's rights of recourse to recover the costs of its guarantee.  The effect of these stratagems by AWB (USA) was to allow its sister company, AWB (Geneva), to appropriate the cash and soybeans of the importers as security for its obligation to ANZ Bank, in derogation of the rights and security to which Standard Chartered and the CCC were entitled.  These tactics, if not precisely meeting the definition of fraud, amount to something very much like it.

When the CCC discovered this arrangement, the CCC asserted its own overriding interest to the recoveries from the importers.  It determined that the standby letter of credit to Standard Chartered was supported by the importers' cash and soybeans and, at least indirectly, paid by liquidation of such cash and soybeans, and that Standard Chartered's recovery, albeit from the standby letter of credit, was a recovery funded by the underlying security pledged by the importers, a recovery to which the CCC was entitled to the extent of 65 percent.  The CCC took recourse against the most convenient source: its own guarantee obligation to Standard Chartered, as assignee of AWB (USA), holding back so much of its guarantee as equaled 65 percent of the sums received by Standard Chartered from ANZ's letter of credit.[23]

---

[23] 7 C.F.R. § 1493.520(b)(1) ) ("In the event that monies for a defaulted payment are recovered by the exporter or the exporter's assignee from the importer or from any other source whatsoever, such monies shall immediately be paid to the Treasurer, CCC.").

At this point, AWB (USA) was whole, having been paid in full by Standard Chartered when Standard Chartered discounted the importers' 180-day notes less LIBOR plus a half-percent.  AWB (Geneva) also was whole, having liquidated the cash and soybeans pledged by the importers, thereby repaying itself for the amounts it paid to ANZ Bank.  Standard Chartered, however, instead of being fully secured by the CCC 65 percent guarantee and the ANZ Bank's 35 percent letter of credit as it had reasonably expected, was left with a loss of $22,647,449.63, plus interest in the amount of $1,212,326.07, for a total of $23,859,775.70.

It is axiomatic that while a party may freely assign its rights under a contract and, as a result, lose any interest in those rights, it remains liable when it delegates its duties to a third party.  Farnsworth on Contracts § 11 (3d ed. 2004).  As the Second Circuit stated the rule, "It is true, of course, as a general rule, that when rights are assigned, the assignor's interest in the rights assigned come to an end.  When duties are delegated, however, the delegant's obligations do not come to an end. . . . The act of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed."  Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 924 (2d Cir. 1977).  Although the notes assigned to Standard Chartered were without recourse to AWB (USA), AWB (USA) could not undermine the integrity of the rights it assigned to Standard Chartered by interposing its sister company in Switzerland, AWB (Geneva).  If, as is clear, AWB (USA) owed recoveries from importers to the CCC and to Standard Chartered, it could not evade its duty by allowing its sister company to interpose itself between the importers and their obligees, and appropriate rights belonging, ultimately, to Standard Chartered and the CCC.

Simon Brotherton, the former official of the AWB companies in charge of developing these arrangements, understood that their central purpose was to defeat the CCC's right to the

importers' collateral.[24]  Throughout the negotiations and execution of the NPAAs, Brotherton acted

for both AWB (Geneva) and AWB (USA), as an officer of AWB (Geneva) and as the sole

representative of AWB (USA).  "Under general principles of agency, the authority of an agent is the

power of the agent to do an act or to conduct a transaction on account of the principal which, with

respect to the principal, he is privileged to do because of the principal's manifestations to him."

Green Door Realty Corp. v. TIG Ins. Co., 329 F.3d 282, 289 (2d Cir. 2003) (internal quotation marks

omitted).  An agent's authority to act on behalf of its principal can arise from the principal's

manifestations to the agent or to a third party that reasonably relies on those manifestations.  Id.

AWB (USA) so empowered Brotherton, for no one but Brotherton was given the capacity to conduct

the complicated and sophisticated negotiations of assignment by AWB (USA) of the notes to

Standard Chartered, the delivery of the guarantees by AWB (USA) to Standard Chartered, the

formulation of the representations, covenants and warranties to Standard Chartered, and the

empowerment of AWB (Geneva), also acting through Brotherton, to appropriate and impair the

sources of payment by the importers of their note obligations assigned by AWB (USA) to Standard

Chartered.   AWB (USA) may have executed its documents by a representative other than

Brotherton, but no one other than Brotherton and his colleague Richardson acted for AWB (USA) in

the negotiations conducted by Brotherton.[25]  There is no evidence of any communications by

Brotherton or Richardson with anyone at AWB (USA) even though AWB (USA) "would eventually

be a signatory to the agreement[s]"[26]  Brotherton's authority to conduct the negotiations on behalf of

AWB (USA) was clear to Standard Chartered, for no one else from AWB (USA) was involved.

Brotherton's knowledge and actions are the knowledge and actions of AWB (USA).  See Wight v.

BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000); see also Farr v. Newman, 14 N.Y.2d 183, 187

---

[24] Trial transcript, at 397-98: "Q:  The whole point of this transparency and opacity was to try to achieve a state of
affairs that would have made AWBG whole without having to account to the Commodity Credit Corporation?"  "A:
Yes."
[25] Id. at 388-90.
[26] Id. at 390.

(1964) ("It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal.")

By trying to defeat the CCC, AWB (USA) was trying to defeat as well the rights of Standard Chartered, for the letter of credit that secured Standard Chartered against the risk of the importers' non-payment could not effectively constitute a guarantee if the CCC was given the capacity to offset its own guarantee obligations to Standard Chartered against that letter of credit. And that which AWB (USA) was contractually unable to do itself, it could not accomplish by interposing a sister company, AWB (Geneva). It is not a matter of piercing corporate veils, as the parties at trial have suggested and repeat in their post-trial motions. It is a matter of requiring a party to a contract to honor the contract and its covenants and not attempt to defeat assigned rights by interjecting an affiliated company.[27]

Standard Chartered, as well as AWB (USA), was entitled to the benefit of its bargain. See Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236, 239 (6th Cir. 1994) ("The essence of contract law is the bargain: parties of equivalent bargaining power negotiate the terms of the transaction and each is then entitled to the benefit of the bargain."). Neither had the right to undermine the other's reasonable expectations, or to make performance more difficult, for "there exists an implied covenant of good faith and fair dealing" in every contract. Lowell v. Twin Disc, Inc., 527 F.2d 767, 770-71 (2d Cir. 1975) (applying New York law).

---

[27] The situation is analogous to the breach of the covenant of good faith and fair dealing as described in the Second Restatement of Contracts:

> A, an oil dealer, borrows $100,000 from B, a supplier, and agrees to buy all his requirements of certain oil products from B on stated terms until the debt is repaid. Before the debt is repaid, A makes a new arrangement with C, a competitor of B. Under the new arrangement A's business is conducted by a corporation formed and owned by A and C and managed by A, and the corporation buys all its oil products from C. The new arrangement may be found to be a subterfuge or evasion and a breach of contract by A.

Restatement (Second) of Contracts § 205, illus. 1. AWB (USA) essentially hid behind its affiliate, AWB (Geneva), to evade its own obligations under the contract.

> It is a fundamental principle of law that in every contract there exists an implied covenant of good faith and fair dealing.  Furthermore, each contract contains an implicit understanding that neither party will intentionally do anything to prevent the other party form carrying out his part of the agreement.  Persons invoking the aid of contracts are under an implied obligation to exercise good faith not to frustrate the contracts into which they have entered.  It is likewise implied in every contract that there is a duty of cooperation on the part of both parties.

See also Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980) ("In every contract, there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement") (internal citations and quotation marks omitted) (applying New York law); Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163, 187 (N.Y. 1933) ("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."); Farnsworth on Contracts § 7.17b (3d ed. 2004) ("The implied covenant [of good faith] enjoins each party 'to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish this purpose." (quoting Conoco v. Inman Oil Co., 774 F.2d 895, 908 (8th Cir. 1985)).

Lowen v. Tower Asset Management, 829 F.2d 1209, 1220 (2d Cir. 1987), is instructive.[28]  The case involved allegations of breach of fiduciary duty under ERISA due to self-dealing transactions, effected, both by a corporate manager, who was a "fiduciary" under the plan, and by a related investment banking corporation, a related broker-dealer corporation, and their common individual owners.  The related corporations and the common owners appealed a judgment for plaintiff, claiming that they had no liability under ERISA because they were not fiduciaries.  The

---

[28]   Lowen v. Tower Asset Management was decided by a federal court under a federal statute, ERISA.  But that does not mean that a state court would not incorporate its principles as a matter of state substantive law.  Lowen is consistent with New York substantive law, as described in the previous paragraphs in the text and, I hold, is expressive of New York State contract principles, and would be followed by a New York court.  The post-trial arguments of AWB (USA), seeking to argue that because the choice of law clause of the contract provides that New York substantive law governs, Lowen is inapplicable, are not meritorious.  Cf. O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994) (holding that there is no federal common law).  There is no conflict between Lowen and New York substantive law.

Court of Appeals held that the separate corporate form of the non-fiduciaries was irrelevant in light of the importance of giving effect to ERISA's broad purpose.   A fiduciary cannot evade its obligations as a fiduciary by interposing an affiliated corporation to do that which it, itself, cannot do. Quoting from <u>First National City Bank v. Banco Para el Comercio Exterior de Cuba</u>, 462 U.S. 611, 630 (1983), the Court of Appeals held that "corporate form [cannot be] interposed to defeat legislative policies."   Continuing, the Second Circuit ruled:

> Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control."   <u>Id.</u>

AWB (USA) understood that Standard Chartered had not assumed the risk of importers' non-payments, and that the purpose of the ANZ Bank-issued standby letter of credit was to assure that it would be secured in full over and above the CCC 65 percent guarantee.  Although AWB (USA)'s assignment to Standard Chartered was "without recourse," that provision affected the status of AWB (USA) as guarantor, and not its duties under the guarantees it delivered to Standard Chartered and the covenants of the NPAA relating to those guarantees. AWB (USA) breached those covenants – the covenant to "maintain in force" the CCC guarantee, NPAA ¶ 3(c), the covenant to do "all things necessary on its part to cause the Payment Guarantee to be in full force and effect," <u>Id.</u> ¶ 3(g), and its covenant "to comply . . . with all regulations and requirements of CCC so as to insure that the Payment Guarantee remains in full force and effect," <u>Id.</u> ¶ 3(k)—and its duty not to impair Standard Chartered's reasonable expectations in relation to those guarantees and related covenants. In consequence of AWB (USA)'s breaches, CCC offset $22,660,790.40 against its guaranty obligation to Standard Chartered, as Assignee of the notes made by the importers to AWB (USA). The CCC later remitted to Standard Chartered an additional $13,340.77 received from the importers after December 2004, reducing Standard Chartered's loss to $22,647,449.63.  For the reasons discussed in this Opinion, AWB (USA)'s breach of contract caused this loss, and Standard Chartered

may recover that amount, $22,647,449.63, from it, plus interest of $1,212,326.07 through November 20, 2007, for a total of $23,859,775.70 plus interest thereafter and costs.

## Conclusion

Judgment was properly entered in favor of Standard Chartered Bank and against AWB (USA), Ltd., in the amount of $23,859,775.70, inclusive of interest to November 20, 2007, plus interest thereafter and costs.

SO ORDERED.

Dated:      February 6, 2010
            New York, New York

                                        _____
                                        ALVIN K. HELLERSTEIN
                                        United States District Judge